**NORTHWEST AIRLINES, INC.,**
**Petitioner,**

v.

**Neil E. GOLDSCHMIDT, Secretary of the Department of Transportation et al.,**
**Respondents,**

and

**Pan American Airways et al.,**
**Intervenors.**

**No. 80–2015.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 15, 1981.

Decided April 2, 1981.

Ronald D. Eastman (argued), Jeffrey D. Komarow, Barry S. Spector, Cadwalader, Wickersham & Taft, Washington, D. C., for petitioner Northwest Airlines, Inc. and intervenors.

Gerry Levenberg, P.C. (argued), and Jeffrey S. Christie, Van Ness, Feldman & Sutcliffe, A Professional Corp., Washington, D. C., for New York Air.

Thomas G. Allison, Gen. Counsel, U. S. Dept. of Transportation (argued), Kenneth Weinstein, Trial Atty., U. S. Dept. of Transportation, Washington, D. C., for respondents.

Before BRIGHT, McMILLIAN and ARNOLD, Circuit Judges.

McMILLIAN, Circuit Judge.

Northwest Airlines, Inc. (Northwest) brought this action for judicial review of Special Federal Aviation Regulation 43 (SFAR 43), 45 Fed.Reg. 72637 (1980) (to be codified at 14 C.F.R. Part 93), issued on October 29, 1980, by the Secretary of the Department of Transportation (the Secretary) under § 307(a), (c) of the Federal Aviation Act of 1958 (the FA Act), as amended, 49 U.S.C. § 1348(a), (c). SFAR 43 temporarily allocates Instrument Flight Rules (IFR) reservations for takeoffs and landings ("slots") at Washington, D. C.'s National Airport (National). Other carriers and interested groups have appeared as intervenors.[1] The Civil Aeronautics Board (CAB) has filed an amicus brief in support of the Secretary.

On November 21, 1980, following oral argument, this court denied Northwest's motion for a stay of SFAR 43 pending review.

---

1. Pan American World Airways, Inc., Air Florida, Inc., Delta Air Lines, Inc., Eastern Air Lines, Inc., and American Airlines, Inc. join Northwest in opposing SFAR 43. New York Airlines, Inc. and ANA, Inc. (Air North) support SFAR 43. Virginians for Dulles, a group of citizens that live in the vicinity of National and generally favor reduced use of National, and the Aircraft Owners and Pilots Association (AOPA), a group representing private aviation interests, also support SFAR 43.

An expedited briefing schedule was established and this appeal followed.

In the late 1960's several of the nation's airports experienced severe congestion, resulting in numerous and substantial delays. In 1968 the Federal Aviation Administration (FAA) issued the High Density Traffic Airports Rule (HDAR), 14 C.F.R. § 93.-121–.133 (1980) (effective April 27, 1969), in order to reduce delays in takeoffs and landings at five crowded airports (Kennedy International Airport, LaGuardia Airport, Newark Airport, O'Hare Airport, and National) and thus promote efficient utilization of the navigable airspace.[2] HDAR limits the number of IFR operations (takeoffs and landings, or "slots")[3] that can be reserved to 60 per hour at National, for 16 hours per day, from 0700 to 2200 hours (7 a. m. to 10 p. m.), and allocates the slots among three different classes of airport users. Commercial air carriers have 40 slots per hour, air taxis have 8 slots per hour, and general or private aviation has 12 slots per hour. 14 C.F.R. § 93.123(a).

HDAR does not limit the total number of operations at high density airports. Operations under Visual Flight Rules (VFR)[4] are not restricted by HDAR, as long as the operation can be accommodated without significant additional delay to reserved operations. *Id.* § 93.129(b). Nor are extra sections of scheduled air carrier flights restricted. *Id.* § 93.123(b)(4). In addition, IFR operations beyond those allocated by reservation are permitted if the operations can be accommodated without significant additional delay to reserved operations. *Id.* § 93.129(a).

Although the need for slot limitations has changed at several of the high density airports since 1968, *see* note 2 *supra*, conditions evidently have not improved at National. Air carrier demands for increased access at National have continued (National is the most conveniently located of the three airports serving the Washington, D. C. metropolitan area; Dulles International Airport and Baltimore/Washington International Airport are farther away from downtown Washington and not on the new Washington subway line). However, the runways, ground facilities and passenger terminals at National are outdated and overcrowded. Severe congestion in the air and on the ground and the prospect of delay remain serious problems. In addition, the communities surrounding National have actively opposed increased use of National, primarily because of noise pollution.

Until October, 1980, allocation of the 40 slots per hour among the air carriers serving National had been achieved by voluntary agreement through airline scheduling committees (ASC) made up of all air carriers operating at the airport, under a grant of antitrust immunity from the CAB. The National ASC meets approximately every six months and reports the terms of the slot allocation agreements to the Airport Reservation Office of FAA's Air Traffic Service.

In October, 1980, the National ASC was unable to reach any agreement on slot allocations for the period after November 30, 1980, largely because a new air carrier, New York Air, announced that it wanted to serve the New York City-Washington, D. C. corridor and requested 20 slots at peak operation hours (early morning and late afternoon), beginning December 1, 1980.[5] In the

---

2. HDAR no longer applies to operations at Newark Airport and only partially applies to operations at Kennedy and O'Hare. 14 C.F.R. § 93.133 (1980).

3. The Instrument Flight Rules are FAA regulations applicable to flight operations in adverse weather conditions. For safety reasons, all air carrier flights must be conducted under IFR regardless of weather conditions. Thus, air carriers must have reservations at high density airports regardless of weather conditions.

4. Aircraft other than air carriers may operate under VFR under favorable weather conditions (generally, when the ceiling is at least 1,000 feet and visibility is at least three miles).

5. Due to other problems, New York Air did not plan to begin actual operations until December 14, 1980, and yielded its slots (as allocated under SFAR 43) for the first two weeks of December. New York Air began its New York-Washington service on December 19, 1980. Brief of New York Airlines, Inc. at 3.

past new entrants had requested fewer slots and had been accommodated by minor adjustments by the other air carriers. New York Air, however, refused to reduce its demand for 20 slots at peak hours, apparently because ten round trip flights per day during commuter hours was the minimum service necessary to compete effectively with Eastern Air Lines' New York-Washington shuttle.

On October 14, 1980, the National ASC notified the FAA by letter that it was unable to agree on slot allocations after November 30, 1980. On October 16, the Secretary issued a Notice and Request for Comments, Notice 80–14, 45 Fed.Reg. 69403 (published on October 20, 1980). The notice requested public comments on the mechanism that should be used for the temporary allocation of IFR reservations or slots available for operations of air carriers at National for the period from December 1, 1980, to April 26, 1981. The notice stated that comments would be received until 5:30 p. m., October 23, 1980. The notice did not describe any specific allocation mechanism. Thirty-seven comments were submitted. On October 29, 1980, the Secretary issued SFAR 43, effective immediately.[6]

SFAR 43 was ostensibly based upon the air carriers' agreement for slot allocations for the period from October 26, 1980, to November 30 and adjusted according to the allocation which had received the most support at the October meeting of the National ASC.[7] Under SFAR 43 several air carriers received fewer slots than they had in November and the twelve carriers with the most slots under the November schedule were required to slide one slot to the less desirable 2200 hour (10 p. m.). The new

entrants and several other carriers received slot allocations from the yielded slots.[8] SFAR 43 specifically provided that any adjustments and exchanges could be made pursuant to any future ASC agreement, subject to CAB authorization. SFAR 43 allocated eighteen slots to New York Air.

In support of its claim that SFAR 43 is unlawful and should be set aside, Northwest argues that (1) the Secretary has no statutory authority to allocate slots among air carriers, (2) SFAR 43 is not a product of "reasoned decision-making" and is "arbitrary and capricious," and (3) the Secretary did not comply with certain procedural requirements before issuing SFAR 43. For the reasons discussed below, we disagree with the arguments advanced by Northwest and deny the petition for review.

### I. Jurisdiction

Neither Northwest nor the Secretary has discussed in detail the question of our jurisdiction to review SFAR 43. The Secretary refers to SFAR 43 as a final order under the FA Act. Northwest states that this court has jurisdiction to review a final order under the FA Act under § 1006(a) of the FA Act, 49 U.S.C. § 1486(a). We agree.

Recent case law, particularly from the Court of Appeals for the District of Columbia Circuit, has construed the word "order" "for purposes of special review statutes expansively, to permit direct review [in the courts of appeals] of regulations promulgated through informal notice-and-comment rule-making." *Sima Products Corp. v. McLucas*, 612 F.2d 309, 313 (7th Cir.) (citations omitted), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1834, 64 L.Ed.2d 260 (1980); *accord, City of Rochester v. Bond*, 195 U.S.

---

**6.** The next day, October 21, 1980, the Secretary issued a Notice of Proposed Rulemaking, proposing several procedures for allocating slots at National on a long-term basis. Notice 80–16, 45 Fed.Reg. 71236 (1980) (published on October 27, 1980).

**7.** Northwest strenuously argues that the National ASC during its October, 1980, meeting never reached any agreement on the slot allocations. Brief of Northwest Airlines, Inc. at 29–30.

**8.** On November 19, 1980, the Secretary issued Notice 80–14a implementing the slot allocation set forth in SFAR 43. Two tables attached as an appendix to the notice describe the final allocation of slots at National on an hour-by-hour basis for the period from December 1 to December 13, 1980 (when New York Air would not be operational) and from December 14 to April 26, 1981 (when New York Air would be operational).

App.D.C. 345, 603 F.2d 927, 932–35 & n.26 (1979); *Investment Company Institute v. Board of Governors*, 179 U.S.App.D.C. 311, 551 F.2d 1270 (1977); *Deutsche Lufthansa Aktiengesellschaft v. CAB*, 156 U.S.App. D.C. 191, 479 F.2d 912 (1973). *See generally* Currie & Goodman, *Judicial Review of Federal Administrative Action: Quest for the Optimum Forum*, 75 Colum.L.Rev. 1 (1975); Verkuil, *Judicial Review of Informal Rulemaking*, 60 Va.L.Rev. 185 (1974). These cases construe "order" "to mean any agency action capable of review on the basis of the administrative record." *Sima Products Corp. v. McLucas, supra*, 612 F.2d at 313.

 We think that the administrative record in the present case is a sufficient basis for judicial review of SFAR 43.[9] The record contains the notice and request for comments published in the Federal Register, some of the comments received by the Secretary, various affidavits, the promulgated rule and its published explanation, and supplementary materials. This record is sufficient for reviewing Northwest's claims of lack of statutory authority, arbitrary and capricious agency action, and procedural inadequacy. *See id.* at 314–15; *Rodway v. United States Department of Agriculture*, 168 U.S.App.D.C. 387, 514 F.2d 809, 816 (1975).

## II. *Statutory Authority*

 Northwest challenges the statutory authority of the Secretary to issue SFAR 43

**9.** In addition, the agency action must be final, that is, "one which imposes an obligation, denied a right, or fixes some legal relationship." *Puget Sound Traffic Ass'n v. CAB*, 175 U.S. App.D.C. 410, 536 F.2d 437, 439 (1976), *citing Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112–13, 68 S.Ct. 431, 436–37, 92 L.Ed. 568 (1948); *see also McManus v. CAB*, 286 F.2d 414, 417 (2d Cir.), *cert. denied*, 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). We think that SFAR 43, although only a temporary allocation of slots, is a final agency action. SFAR 43 denies in part the rights of several air carriers to operate at National and grants such rights to other air carriers.

It was not suggested that SFAR 43 did not meet the finality requirement. We note that motions for reconsideration filed by Air Florida

on a variety of grounds. First, Northwest argues that SFAR 43 is an economic regulation and thus a matter within the exclusive jurisdiction of the CAB. We disagree. Under the bifurcated regulatory scheme designed by Congress to govern civil air transportation, the FA Act divided regulatory responsibility between the CAB and the FAA. The FAA, unlike the CAB, is now a constituent part of the Department of Transportation, *see* § 3(e)(1) of the Department of Transportation Act (DOT Act), 49 U.S.C. § 1652(e)(1). "FAA/DOT bears the primary responsibility for safety regulation while the CAB administers and enforces the economic provisions of the [FA] Act." *Delta Air Lines, Inc. v. CAB*, 177 U.S.App.D.C. 100, 543 F.2d 247, 259 (1976). All regulation, including safety regulation, ultimately has some economic impact. We agree with the Secretary, however, that the fact that SFAR 43 may have an incidental economic impact upon the air carriers operating at National (by limiting particular air carriers' operations) does not transform SFAR 43 into an economic regulation. Rather, we agree with the Secretary that SFAR 43 is neither an economic regulation nor a safety regulation per se, but instead a regulation of the efficient utilization of the navigable airspace of the United States.

The Secretary cites § 307(a), (c) of the FA Act, 49 U.S.C. § 1348(a), (c), as the statutory authority for the issuance of SFAR 43.[10] Section 307(a) of the FA Act, 49 U.S.C. § 1348(a), provides:

and Northwest were denied by the Secretary on December 29, 1980.

**10.** In view of our discussion of the Secretary's authority under § 307(a), (c) of the FA Act, 49 U.S.C. § 1348(a), (c), we do not address the question of the Secretary's asserted authority as the proprietor of National to issue SFAR 43 under § 2 of the Washington National Airport Act, as amended, Pub.L.No. 76–674, 54 Stat. 686 (1940), which provides in part:

The Secretary of Transportation shall have control over, and responsibility for, the care, operation, maintenance, and protection of the airport, together with the power to make and amend such rules and regulations as he may deem necessary to the proper exercise thereof.

The Secretary of Transportation is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.

Section 307(c) of the FA Act, 49 U.S.C. § 1348(c), provides:

The Secretary of Transportation is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

The Secretary argues that the statutory authority to insure the efficient utilization of the navigable airspace clearly encompasses the authority to allocate slots at National.

█ We found little case law [11] directly on point; however, our review is guided by our recognition that the construction of a statute by an agency charged with its administration is entitled to substantial deference by reviewing courts. *E. g., Frontier Airlines, Inc. v. CAB*, 621 F.2d 369, 372 (10th Cir. 1980), *citing United States v. Rutherford*, 442 U.S. 544, 553, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979). We find no compelling indications that the Secretary's interpretation of the statute is wrong. *E. g., United States Steel Corp. v. EPA*, 605 F.2d 283, 293 (7th Cir. 1979) (*citing Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367,

381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). The plain language of the statute grants the Secretary broad authority to "assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure ... the efficient utilization of such airspace," § 307(a) of the FA Act, 49 U.S.C. § 1348(a), and to "prescribe air traffic rules and regulations governing the flight of aircraft, ... for the efficient utilization of the navigable airspace," § 307(c) of the FA Act, 49 U.S.C. § 1348(c). *See also* H.R.Rep.No.2360, 85th Cong., 2d Sess. (hereinafter House Report), *reprinted in* 2 [1958] U.S.Code Cong. & Ad.News 3741, 3741–42, and discussion *infra*.

The term "navigable airspace," as defined in § 101 of the FA Act, 49 U.S.C. § 1301(29), means "airspace above the minimum altitudes of flight prescribed by regulations issued under this chapter, and shall include airspace needed to insure safety in take-off and landing of aircraft." As described in a slightly different context, the scope of federal control of the navigable airspace is

intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection in the hands of federally certificated personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.

*Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283 (1944) (Jackson, J., concurring). Although the issue in the present case is not one of state versus federal control of the navigable airspace, the above description does illustrate that federal control of the navigable airspace is exclusive and comprehensive.

---

11. *Aircraft Owners & Pilots Ass'n v. Volpe*, Civ. No. 927–69 (D.D.C. May 14, 1969), *aff'd per curiam*, No. 23,146 (D.C.Cir. Nov. 19, 1969), is an unpublished case discussed by both the Secretary and Northwest. In this case the Aircraft Owners & Pilots Association sought to enjoin implementation of the HDAR at the five congested airports covered by the regulation. Injunctive relief was denied.

██ Northwest argues, however, that nothing in § 307(a), (c) of the FA Act, 49 U.S.C. § 1348(a), (c), authorizes the Secretary to regulate the efficient use of the navigable airspace other than in relation to safety matters. Because the Secretary does not justify the issuance of SFAR 43 as a safety regulation, Northwest argues that the Secretary does not have the authority to issue a non-safety airspace regulation. We do not read the statute so narrowly and agree with the Secretary that, under the FA Act, the Secretary has responsibility and authority not only for aviation safety but also for airspace management. This responsibility and authority for the *efficient* utilization of the navigable airspace is distinct and in addition to that for aviation *safety*. Both § 307(a) and (c) refer to the safety of aircraft *and* the efficient utilization of the navigable airspace. Section 103(c) of the FA Act, 49 U.S.C. § 1303(c), directs the Secretary to consider, as in the public interest, "[t]he control of the use of the navigable airspace of the United States."

In addition, the legislative history of the FA Act supports the Secretary's claim to a separate responsibility and authority, distinct from that for aviation safety, to regulate the efficient use of the navigable airspace. The House Report describes the responsibility and authority of the Administrator of the newly created Federal Aviation Agency as including both "the advancement and promotion of civil aeronautics generally, including the promulgation and enforcement of safety regulations," and "the management of the national airspace." House Report, *supra*, 2 [1958] U.S.Code Cong. & Ad.News at 3741. The legislative history further expressly describes the "plenary authority" of the Administrator to include both the authority to "allocate airspace and control its use by both civil and military aircraft" and to "make and enforce safety regulations governing the design and operation of civil aircraft." *Id.* at 3741–42. Thus, we conclude that the Secretary's authority to regulate the efficient utilization of the navigable airspace is not restricted to safety considerations only.

██ Northwest further argues that, to the extent the Secretary has authority to regulate the efficient utilization of the navigable airspace, such authority was transferred from the Secretary to the Administrator of the FAA under the proviso contained in § 6(c)(1) of the DOT Act, 49 U.S.C. § 1655(c)(1), and cannot be transferred elsewhere in the Department of Transportation, § 3(e)(4) of the DOT Act, 49 U.S.C. § 1652(e)(4). Northwest thus argues that only the FAA has authority to regulate the use of the navigable airspace and to issue SFAR 43. We disagree. Section 6(c)(1) of the DOT Act, 49 U.S.C. § 1655(c)(1), provides in part:

There are hereby transferred to and vested in the Secretary all functions, powers, and duties of the Federal Aviation Agency, and of the Administrator and other officers and offices thereof, including the development and construction of a civil supersonic aircraft: *Provided, however,* That there are hereby transferred to the Federal Aviation Administrator, and it shall be his duty to exercise the functions, powers, and duties of the Secretary pertaining to aviation safety (other than those relating to the transportation, packaging, marking, or description of hazardous materials) as set forth in sections 306, 307, 308, 309, 312, 313, 314, 1101, 1105 and 1111 [49 U.S.C. 1347, 1348, 1349, 1350, 1353, 1354, 1355, 1501, 1505, and 1511], and titles VI, VII, IX, and XII [49 U.S.C. 1421 et seq., 1441 et seq., 1471 et seq., and 1521 et seq.] of the Federal Aviation Act of 1958, as amended.

As noted by the Secretary, the proviso in this section transfers from the Secretary to the Administrator of the FAA "the functions, powers, and duties of the Secretary [earlier transferred to the Secretary from the Federal Aviation Agency] *pertaining to aviation safety.*" *Id.* (emphasis added). Because all the parties agree that SFAR 43 is *not* a safety regulation, it would seem that SFAR 43 is not a matter of aviation safety transferred to the FAA under the

proviso of § 6(c)(1), 49 U.S.C. § 1655(c)(1), and thus is not a matter reserved exclusively to the FAA.

We note that the Secretary has delegated by regulation to the Administrator of the FAA the authority to carry out the powers and duties transferred to the Secretary by § 6(c)(1) of the DOT Act, 49 U.S.C. § 1655(c)(1). 49 C.F.R. § 1.47(a) (1980). This subdelegation of authority by the Secretary to the Administrator of the FAA, however, does not deprive the Secretary of the authority, vested in the Secretary by statute, to act. *Cf. Campbell v. Doe,* 54 U.S. (13 How.) 244, 249, 14 L.Ed. 130 (1852).[12]

### III. *On the Merits*

Northwest also attacks SFAR 43 on the merits, arguing that SFAR 43 is arbitrary, capricious and unreasonable, and thus not a product of "reasoned decision-making," *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). Northwest specifically argues that the Secretary erroneously relied upon the October 1980 meeting of the National ASC as a basis for the slot allocation in SFAR 43; that SFAR 43 capriciously favors a particular market, the New York-Washington market, and a particular carrier, New York Air, at the expense of other markets and other carriers; that the Secretary arbitrarily refused to consider temporarily suspending the HDAR operations ceiling limitation at National; and that the Secretary failed to consider temporarily reducing the slot allocations of general or private aviation as an alternative to SFAR 43.

■ In promulgating SFAR 43, the Secretary engaged in informal rulemaking, subject to the procedural requirements of § 4 of the Administrative Procedure Act (APA), 5 U.S.C. § 553, and to judicial review under § 10 of the APA, 5 U.S.C. § 706(2)(A)-(D). *See* §§ 307(d), 1006(a) of the FA Act, 49 U.S.C. §§ 1348(d), 1486(a). "Our role as a reviewing court is a limited one." *National Small Shipments Traffic Conference, Inc. v. CAB,* 199 U.S.App.D.C. 335, 618 F.2d 819, 826 (1980). We must affirm the challenged regulations unless we find the Secretary's action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." § 10(e)(2)(A) of the APA, 5 U.S.C. § 706(2)(A).

> This standard of review is a highly deferential one. It presumes agency action to be valid. Moreover, it forbids the court's substituting its judgment for that of the agency and requires affirmance if a rational basis exists for the agency's decision.
>
> That is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming) ritual. Rather, the reviewing court must assure itself that the agency decision was "based on a consideration of the relevant factors" ... [and that the agency] "has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent."

*Ethyl Corp. v. EPA,* 176 U.S.App.D.C. 373, 541 F.2d 1, 33–36 (banc) (citations and footnotes omitted), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

■ First, we must determine whether the Secretary has "made out a case for rulemaking at all [because] a 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.'" *Home Box Office, Inc. v. FCC,* 185 U.S.App. D.C. 142, 567 F.2d 9, 36, *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977), *citing City of Chicago v. FPC,* 147 U.S.App.

---

12. And where a duty is especially enjoined on the Secretary of the Treasury, although he may perform it through the Commissioner of the General Land-Office, who may well be presumed to act under his authority where the contrary does not appear; yet where the Secretary has interposed and decided the matter, as in the case under consideration, his decision must be considered as the only one under the law.
*Campbell v. Doe,* 54 U.S. (13 How.) 244, 249, 14 L.Ed. 130 (1852).

D.C. 312, 458 F.2d 731, 742 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1971). We are satisfied that there is evidence in the record which supports the need for rulemaking. As discussed above, in 1968 the FAA limited IFR reservations for air carrier operations at National to 40 per hour under the HDAR, primarily to alleviate congestion and delays, in the air and on the ground, caused by the increasing commercial demands on the outdated and limited facilities at that airport. Demands for access by air carriers consistently exceeded the 40 operations or slots per hour limitation and, for more than a decade, the competing demands of the air carriers were resolved voluntarily by the National ASC. In October, 1980, the National ASC was unable to reach an agreement as to slot allocations for the period after November 30, 1980. Thus faced with the prospect of an emergency (the Secretary refers to the prospect of "chaos in the skies"), the Secretary decided an alternate method for allocating the 40 slots per hour among the air carriers would have to be developed and implemented. SFAR 43 was the ultimate result.

■ Under the standard of review outlined above, we must affirm the Secretary's action unless it is "arbitrary or capricious." We have carefully reviewed the record and find that the Secretary's action is supported by a rational basis. *See Ethyl Corp. v. EPA, supra,* 541 F.2d at 37. In other words, we find that SFAR 43 is rational, based upon a consideration of all the relevant factors, and adequately explained. *See Citizens to Protect Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). At the heart of SFAR 43 is an attempt to administratively accommodate the demands of the air carriers for increased access to National with the physical limitations imposed by the condition and age of the airport's facilities, the surrounding communities' desire for reduced aircraft noise, and the need for "efficient utilization of the navigable airspace." The Secretary also sought to minimize disruption of existing airline schedules and service patterns, to provide adequate advance notice to the traveling public, and to consider the procompetitive policy of the Airline Deregulation Act of 1978, Pub.L.No. 95–504, 92 Stat. 1705 (amending the FA Act, 49 U.S.C. § 1301 *et seq.*). The Secretary developed SFAR 43 by using the November, 1980, slot allocation as a basis and then adjusting that allocation by consideration of the October, 1980, meeting of the National ASC. In essence SFAR 43 requires five carriers to give up one or more slots in specific hours during the day, requires twelve carriers to "slide" one slot to the latest hour of operations (2200 hours or 10 p. m.), and then reserves and allocates the yielded slots among the new entrants and several other carriers.

■ With respect to the specific challenges made by Northwest, we note first that the Secretary recognized that the carriers in fact reached no agreement during the October, 1980, meeting of the National ASC. In an effort to disrupt airline schedules as little as possible, the Secretary viewed the October, 1980, meeting as an approximation of the agreement that the air carriers came closest to adopting and used it to adjust the November, 1980, allocation. The fact that the air carriers did not reach a final agreement (which failure precipitated the need for rulemaking in the first place) does not mean that the Secretary could not use the proposal the carriers came closest to adopting as a basis for rulemaking.

■ Nor do we agree that the Secretary improperly favored the New York-Washington market and New York Air. As noted by the Secretary, SFAR 43, including the eighteen slots allocated to New York Air, was based in large part upon the October, 1980, meeting of the National ASC, during which proceeding several votes indicated that many of the carriers supported such an allocation. The record shows that the Secretary did not consider the need for increased service in the New York-Washington market or any particular market before issuing SFAR 43, other than to note that additional reduced fare service would

increase competition and thus be consistent with the general procompetitive policy of the Airline Deregulation Act of 1978. We also note that the allocation of slots under SFAR 43 is not tied to a carrier's service in any particular market; carriers may use allocated slots at National to provide service between Washington, D. C. and other cities, subject to CAB approval.

Nor can we agree that the Secretary failed to consider all relevant factors or to consider alternatives, such as temporarily suspending the HDAR carrier limit of 40 IFR reservations per hour or reducing the HDAR general or private aviation limit of 12 IFR reservations per hour. The Secretary addressed several proposed alternatives and explained why modification of HDAR was not an acceptable alternative. Briefly, the Secretary noted that the congestion at National which prompted the implementation of HDAR has in no way abated and that, in view of the proposed *reduction* of carrier slots from 40 to 36 per hour, as of April 26, 1981, under the Metropolitan Washington Airports Policy, any modification of the HDAR to increase carrier operations, even temporarily, would be inconsistent with such policy.

 Finally, we note that our standard of review of the Secretary's action is one of minimal rationality. Our task has been to carefully examine the record to ensure, as a matter of administrative law, that the Secretary's action was rational and based on consideration of the relevant factors. We do not pass judgment upon the wisdom of the Secretary's action nor are we empowered to substitute our decision for that of the Secretary. Frankly, we believe the carriers' substantive objections to SFAR 43 could be fairly summarized as dissatisfaction with the Secretary's decision, which is, of course, not a basis for invalidation of administrative action. *See Citizens to Pro-*

*tect Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823; *Ethyl Corp. v. EPA, supra,* 541 F.2d at 36–37 & nn. 76–78.

## IV. Procedural Adequacy

Northwest next argues that the Secretary violated the procedural requirements of the APA, 5 U.S.C. § 553,[13] by providing inadequate notice of the rulemaking proceedings, by allowing inadequate time for comment, and by making the final rule effective on its date of issuance.

Northwest first alleges that the Secretary was actively considering an allocation proposal like SFAR 43 at the time the notice was issued and therefore should have incorporated the proposal or proposals then under consideration in the notice and request for comments. We disagree.

Section 4 [of the APA] requires that prior to final promulgation of a rule the agency must make public "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The courts have added useful flesh to this statutory language. The notice should be sufficiently descriptive of the "subjects and issues involved" so that interested parties may offer informed criticism and comments. But the notice need not contain "every precise proposal which [the agency] may ultimately adopt as a rule." *Ethyl Corp. v. EPA, supra,* 541 F.2d at 48 (citations omitted), *citing California Citizens Band Ass'n v. United States,* 375 F.2d 43, 48 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

 We do not know whether the Secretary was in fact actively considering a particular method of slot allocation at the time the notice and request for comments was issued. We note that publication of the terms or substance of a proposed rule in

---

**13.** 5 U.S.C. § 553(b) provides in part:

General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

fact under consideration by the agency would certainly be more consistent with the spirit of the APA. However, the notice requirement may be satisfied either by publication of "the terms or substance of the proposed rule or a description of the subjects and issues involved." Here, the notice requested public comment on the mechanism that should be used for the temporary allocation of IFR reservations or slots available for air carrier operations under the HDAR at National. We find this brief statement was "sufficiently descriptive of the 'subjects and issues involved' so that interested parties [could] offer informed criticism and comments." *Ethyl Corp. v. EPA, supra,* 541 F.2d at 48. We note that the Secretary received thirty-seven comments from air carriers and other interested parties in just seven days.

Northwest also argues that the seven-day period allowed for comments was totally inadequate. The Secretary defends this unusually short comment period on the basis of the "good cause" exception of 5 U.S.C. § 553(b)(B). Section 553(b)(B) provides that

notice and comment may be excused "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."[14] In addition, Northwest challenges the Secretary's decision to make SFAR 43 effective upon the date of issuance. The Secretary justifies this action under the "good cause" exception of 5 U.S.C. § 553(d)(3). Section 553(d)(3) provides that "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except ... as otherwise provided by the agency for good cause found and published with the rule."

 Although some dispute exists over whether the "good cause" exception of § 553(d)(3) encompasses more situations than the "good cause" exception of § 553(b)(B),[15] we need not determine in the present case whether the two "good cause" exceptions carry the same meaning.[16] In

---

**14.** The propriety of administrative reliance upon the "good cause" exception in 5 U.S.C. § 553(b)(B) in order to dispense with the APA's requisite notice-and-comment in the context of certain regulations promulgated by EPA under the constraints of tight statutory deadlines established by the Clean Air Act Amendments of 1977, Pub.L.No. 95–95, 91 Stat. 685 (recodified at 42 U.S.C. §§ 7401–7642 (Supp. I 1977)), has been the subject of controversy in recent case law. See discussion in *New Jersey v. EPA,* 200 U.S.App.D.C. 174, 626 F.2d 1038, 1045–49 (1980). *Compare Western Oil & Gas Ass'n v. EPA,* 633 F.2d 803 (9th Cir. 1980) (no "good cause"); *New Jersey v. EPA, supra,* 626 F.2d 1038 (no "good cause"); *United States Steel Corp. v. EPA,* 595 F.2d 207 (5th Cir.) (no "good cause"), *rehearing granted in part,* 598 F.2d 915 (1979); *Sharon Steel Corp. v. EPA,* 597 F.2d 377 (3d Cir. 1979) (no "good cause"), *with Republic Steel Corp. v. Costle,* 621 F.2d 797 (6th Cir. 1980) ("good cause"); *United States Steel Corp. v. EPA,* 605 F.2d 283 (7th Cir. 1979) ("good cause"), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

**15.** *Compare* the position of the Seventh Circuit in *United States Steel Corp. v. EPA, supra,* 605 F.2d at 289–90 ("good cause" under § 553(d)(3) should encompass more situations than "good cause" under § 553(b)(B)), *with* the position of the District of Columbia Circuit in *New Jersey v. EPA, supra,* 626 F.2d at 1048 (§ 553(d)(3)

and § 553(b)(B) should be interpreted similarly). *See also* 1 K. Davis, Administrative Law Treatise § 6.29, at 590 (2d ed. 1978) (similar construction).

**16.** In *United States v. Gavrilovic,* 551 F.2d 1099 (8th Cir. 1977), we considered what constitutes "good cause" under § 553(d)(3). We noted from that section's legislative history that

the APA was not intended to unduly hamper agencies from making a rule effective immediately or at some time earlier than 30 days. However, ... the good cause exception was not to be an "escape clause which may be arbitrarily exercised but requires legitimate grounds supported in law and fact by the required finding." Legitimate grounds were defined as an "urgency of conditions coupled with demonstrated and unavoidable limitations of time," and that the primary consideration was to be the "convenience or necessity of the people affected."

. . . .

We think it clear that Congress intended to impose upon an administrative agency the burden of showing a public necessity for an early effective date and that an agency cannot arbitrarily find good cause. In determining whether the good cause exception is to be invoked, an administrative agency is required to balance the necessity for immediate imple-

our view the urgent necessity for rapid administrative action under the circumstances of the present case would justify the Secretary's finding of "good cause" under either exception. On October 14, 1980, the FAA first learned that the National ASC, for the first time in its history, would be unable to agree on slot allocations after November 30, 1980. Within two days, on October 16, 1980, the Secretary issued Notice 80–14, 45 Fed.Reg. 69403 (published October 20, 1980), requesting comments until October 23, 1980. The November slot allocation was going to expire on November 30, 1980. Some lead time was required to enable the carriers to make any necessary schedule adjustments, to notify the traveling public, and to rearrange ticket reservations taken under unapproved schedules already submitted by the carriers to the Official Airline Guide (OAG). The closing date for the submission of "Stop Press" pages for the December 1, 1980, issue of the OAG was November 6, 1980. The closing date for the submission of schedules to the December 15, 1980, issue of the OAG was November 4, 1980. Obviously, the rapid resolution of the slot allocation problem at National was not only in the interest of the *traveling* public, particularly on the eve of the winter holiday season, but also consistent with the national interest in the efficient utilization of the navigable airspace. We recognize that "judicial review of a rule promulgated under an exception to the APA's notice-and-comment requirement must be guided by Congress's expectation that such exceptions will be narrowly construed ... and only reluctantly countenanced." *New Jersey v. EPA*, 200 U.S.App. D.C. 174, 626 F.2d 1038, 1045 (1980) (citations omitted) (discussion of 5 U.S.C. § 553(b)(B)). Under the circumstances of the present case, however, we find that "good cause" existed to justify the Secre-

tary's decision to reduce the period for comments and declare the regulation effective upon issuance.

 Northwest next argues that SFAR 43 constituted a form of licensing, not rulemaking, and therefore required an adjudicatory hearing under the APA because SFAR 43 modifies the carriers' existing rights to operate at National. We do not agree. In our view SFAR 43 is a "rule" under the definition set out in the APA: "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy ...." 5 U.S.C. § 551(4). SFAR 43 does not lose its character as a rule because it modifies carriers' claimed rights[17] to slot allocations at National. *See Air Line Pilots Ass'n International v. Quesada*, 276 F.2d 892, 896 (2d Cir. 1960) (challenge to FAA rule limiting pilot licenses to age 60), *cert. denied*, 366 U.S. 962, 81 S.Ct. 1923, 6 L.Ed.2d 1254 (1961).

 Northwest next argues that the Secretary's failure to prepare an environmental impact statement (EIS) violated § 102(2)(C) of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C), because SFAR 43 requires an increase in the number of reserved carrier operations (from 22 to 37) scheduled during the latest hour of operations at National (2200 hours or 10 p. m.). The Secretary, however, argues that the maximum number of reserved carrier operations, 40 slots per hour, as established under the HDAR, is not changed by SFAR 43. SFAR 43 does not require an increase in carrier operations at 2200 hours (10 p. m.). The carriers remain free under both SFAR 43 and the HDAR to arrange their schedules as necessary up to the 40 slot per hour limit. SFAR 43 does not change the HDAR Limitations.[18] Be-

---

mentation against principles of fundamental fairness which require that all affected persons be afforded a reasonable time to prepare for the effective date of *its* ruling. *Id.* at 1104–05 (citations and footnotes omitted).

**17.** The Secretary asserts that under the ASC agreements, no particular carrier is entitled to

a slot and no carrier has any kind of "grandfather" rights in its existing slot allocation. Brief of the Secretary at 46.

**18.** We note that the Secretary is under a district court order not to implement any changes in the HDAR at National. *Virginians for Dulles*

cause the potential number of reserved carrier operations under the HDAR remains the same under SFAR 43, the environmental impact of SFAR 43 is minimal. Moreover, the Secretary in promulgating SFAR 43 has in effect only substituted one method of slot allocation (the mandatory reallocation in SFAR 43) for another (the voluntary reallocation of the ASC). We find that the promulgation of SFAR 43 did not constitute a "major federal action significantly affecting the quality of the human environment" and therefore no EIS was required.

Northwest finally argues that the Secretary improperly failed to prepare a regulatory analysis of economic impact as required by DOT Regulatory Policies and Procedures, 44 Fed.Reg. 11034 (1979), implementing Executive Order No. 12044, 43 Fed.Reg. 12661 (1978). We do not agree. The Secretary determined that although SFAR 43 did not merit a regulatory impact analysis under ¶ 10(a), (f)[19] of the DOT Regulatory Policies and Procedures, it was a significant regulation because it concerned a matter in which there was substantial public interest and thus did require the preparation of a regulatory evaluation. However, under ¶ 10(g)[20] of the DOT Regulatory Policies and Procedures, the preparation of the requisite regulatory analysis or evaluation may be delayed until after the issuance of an emergency regulation. We earlier discussed the time limitations and the need for urgent administrative action which faced the Secretary in late October, 1980, prior to the issuance of SFAR 43. We note that the Secretary did prepare a regulatory evaluation of SFAR 43, issued on December 29, 1980, in which the economic impact of SFAR 43 was found to be minimal.[21]

Accordingly, the petition for review is denied.

---

v. *Goldschmidt*, Civ. No. 507–70–A (E.D.Va. Sept. 21, 1979) (order on remand). Although we express no opinion as to its sufficiency, we also note the Secretary has prepared a final EIS evaluating the environmental impact of the Washington National Airport Policy, including the proposed reduction of reserved carrier operations under the HDAR to 36 slots per hour, effective April 26, 1981. *See* 45 Fed.Reg. 62398, 62405 (Sept. 18, 1980).

19. ¶ 10(a), (f), 44 Fed.Reg. 11034, 11043 (1979), provides:

a. Except as indicated in paragraph 10g of this Order, an initiating office prepares and places in the public docket a draft Regulatory Analysis for each of its proposed regulations that:

(1) Will result in an annual effect on the economy of $100 million or more;

(2) Will result in a major effect on the general economy in terms of costs, consumer prices, or production;

(3) Will result in a major increase in costs or prices for individual industries, levels of government, or geographic regions;

(4) Will have a substantial impact on the United States balance of trade; or

(5) The Secretary or head of the initiating office determines deserves such analysis.

. . . .

f. The initiating office prepares a final Regulatory analysis for each final regulation that meets the criteria of paragraph 10a of this Order, otherwise, a final Evaluation, in accordance with the requirements of paragraph 10e of this Order, is prepared. The Regulatory Analysis or the Evaluation is placed in the public docket at the time of or before issuing the final regulation and the regulation is accompanied by a statement of how the public may obtain a copy of the Regulatory Analysis or the Evaluation for review.

20. ¶ 10(g), *id.*, provides:

g. An emergency regulation that otherwise would be nonsignificant is excepted from the requirements for any Evaluation. For an emergency regulation that otherwise would be significant, the initiating office prepares and places in the public docket as soon as possible after issuance of the notice or final regulation a Regulatory Analysis or Evaluation, whichever is appropriate, unless an exception is granted by the Secretary.

21. The regulatory evaluation did state that if further accounting data demonstrated other than minimal economic impact, supplementary analysis of SFAR 43 would be undertaken as part of the regulatory analysis prepared for the proposed *permanent* slot allocation regulation. *See* Notice 80–16, 45 Fed.Reg. 71236 (Oct. 27, 1980).