GEE, Circuit Judge:
The facts and procedural history of this case are exceedingly complex. However, the succinct summary by the district court below is sufficient to afford an understanding of our decision today:
On May 13, 1982, Braniff and Braniff International Corporation (“International”) filed petitions for reorganization under Chapter 11 of the Bankruptcy Code (the “Code”) and were continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Code. No trustee or examiner was appointed. Shortly thereafter, to minimize the effect of Braniff s termination of service, the Department of Transportation and Federal Aviation Administration (DOT/FAA) distributed to other carriers, on an emergency basis, approximately 100 of the over 400 [landing] slots allocated to Braniff. [For safety reasons, the FAA allocates hourly landing slots at airports among the various airlines. See Part II, infra.] On May 24, 1982, DOT/FAA issued Special Federal Aviation Regulation (“SFAR”) 44-4, 47 Fed. Reg. 22,492 (1982) providing for allocation of the remaining slots formerly used by Braniff through participation by air carriers in a random draw.
Thereafter, on May 27, 1982, the Unsecured Creditors’ Committee filed an Application seeking a declaration of whether the FAA allocation of former Braniff slots constituted a violation of the automatic stay under 11 U.S.C. § 362 or of a temporary restraining order entered earlier by the Bankruptcy Court proscribing interference with Braniff’s property. On June 24, 1982, the Bankruptcy Court approved a stipulation among the United States, Braniff, and the Unsecured Creditors’ Committee, stating that the slots would be recalled and made available “[s]hould Braniff or an air carrier succeeding to the rights, duties and obligations of Braniff begin operations.”
On December 23,1982, Braniff filed an application for approval of a proposed agreement between Braniff and PSA. On December 30, 1982, Braniff filed with the Bankruptcy Court a “Memorandum of Understanding” as a basis for a proposed settlement and compromise of all claims, counterclaims, and potential litigations by and among Braniff, certain unsecured creditors, and certain secured creditors.
Between December 30, 1982, and January 3,1983, various notices of hearings on the proposed agreements were mailed or published. These documents gave notice of a hearing to be held on January 14, 1983, to consider the matters set forth in the PSA Agreement and the Memorandum of Understanding. As stated in these notices, a hearing commenced before United States Bankruptcy Judge John Flowers on January 14, 1983, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Bankruptcy Division.
From January 14, 1983, through January 26, 1983, all interested parties were afforded an opportunity to present evidence on their behalf. The Bankruptcy Court heard oral arguments on January 28,1983, and announced its opinion in this matter on Monday, January 31, 1983. The Bankruptcy Court entered its “Order Regarding the PSA Agreement and Agreement and Stipulation” and its “Findings of Fact and Conclusions of Law Approving the PSA Agreement and Agreement and Stipulation” on February 1, 1983. On that same date, the Bankruptcy Court entered an order pursuant to Sections (e)(2)(A)(i) and (e)(3) of the Local Rule, certifying its order and findings for immediate review to the United *939 States District Court for the Northern District of Texas.
In re Braniff Airways, Inc., No. CA4-8357-E (N.D.Tex. Feb. 18, 1983) (unpublished memorandum opinion).
The Bankruptcy Court approved both the PSA Agreement and the Memorandum of Understanding between Braniff and its creditors (both agreements hereinafter jointly referred to as the “PSA transaction”). Pursuant to a Local Rule,[1] the district court conducted a de novo review of the Bankruptcy Court’s findings. In three days of hearings, the district court heard testimony, received evidence and heard oral argument. Thereafter, the district court, as had the Bankruptcy Court, approved the PSA transaction. Because business exigencies required that the PSA transaction be consummated soon if it was to happen at all, we granted this expedited appeal.
Three principal issues are presented. First, was the district court’s approval of the PSA transaction authorized under Section 363(b) of the Bankruptcy Code, 11 U.S.C. § 363(b)? Second, did the district court have the power to order the FAA to allocate certain landing “slots” at various airports to Braniff so that Braniff could transfer them in the PSA transaction? Third, did the district court have the power to order Braniff’s assumption of its defaulted lease on terminal facilities at Washington National Airport and its subsequent assignment in the PSA transaction without FAA approval?
I.
The courts below approved the PSA transaction pursuant to Section 363(b) of the Bankruptcy Code, which provides:
The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.
11 U.S.C. § 363(b).
The appellants contend that § 363(b) is not applicable to sales or other dispositions of all the assets of a debtor, and that such a transaction must be effected pursuant to the voting, disclosure and confirmation requirements of the Code. See In re White Motor Credit Corp., 14 B.R. 584 (Bkrtcy.N. D.Ohio 1981). Braniff responds that cases decided before and after promulgation of the Code authorize a § 363(b) sale of all of a debtor’s assets. See In re Dania Corp., 400 F.2d 833 (5th Cir.1968); In re WHET, Inc., 12 B.R. 743, 750-51 (Bkrtcy.D.Mass. 1981).
We need not express an opinion on this controversy because we are convinced that the PSA transaction is much more than the “use, sale or lease” of Braniff’s property authorized by § 363(b). Reduced to its barest bones, the PSA transaction would provide for Braniff’s transfer of cash, airplanes and equipment, terminal leases and landing slots to PSA in return for travel scrip, unsecured notes, and a profit participation in PSA’s proposed operation. The PSA transaction would also require significant restructuring of the rights of Braniff creditors. Appellants raise a blizzard of objections to each of these elements of the deal. It is not necessary, however, to decide whether each individual component of the PSA transaction is or is not authorized by § 363 because the entire transaction was treated by both courts below as an integrated whole. Since certain portions of the transaction are clearly outside the scope of § 363, the district court was without power under that section to approve it. Its order must be reversed.
Three examples will illustrate our rationale. The PSA Agreement provided that Braniff would pay $2.5 million to PSA in exchange for $7.5 million of scrip entitling the holder to travel on PSA. It further required that the scrip be used only in a future Braniff reorganization and that it be issued only to former Braniff employees or shareholders or, in a limited amount, to unsecured creditors. This provision not only changed the composition of Braniff s assets, the contemplated result under *940 § 363(b), it also had the practical effect of dictating some of the terms of any future reorganization plan. The reorganization plan would have to allocate the scrip according to the terms of the PSA agreement or forfeit a valuable asset. The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets.
Second, under the agreement between Braniff and its creditors, the secured creditors were required to vote a portion of their deficiency claim in favor of any future reorganization plan approved by a majority of the unsecured creditors’ committee. Again, such an action is not comprised by the term “use, sell, or lease,” and it thwarts the Code’s carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned. See 11 U.S.C. § 1126.[2]
Third, the PSA transaction also provided for the release of claims by all parties against Braniff, its secured creditors and its officers and directors. On its face, this requirement is not a “use, sale or lease” and is not authorized by § 363(b).
For these reasons, we hold that the district court was not authorized by § 363(b) to approve the PSA transaction and that its order is reversed. In any future attempts to specify the terms whereby a reorganization plan is to be adopted,'the parties and the district court must scale the hurdles erected in Chapter 11. See e.g. 11 U.S.C. § 1125 (disclosure requirements); id. § 1126 (voting); id. § 1129(a)(7) (best interest of creditors test); id. § 1129(b)(2)(B) (absolute priority rule). Were this transaction approved, and considering the properties proposed to be transferred, little would remain save fixed based equipment and little prospect or occasion for further reorganization. These considerations reinforce our view that this is in fact a reorganization.
II.
Because of sharply reduced air traffic control capacity caused by the strike of the Professional Air Traffic Controllers Organization in the summer of 1981, the FAA instituted a program for curtailing air carrier operations. See Special Federal Aviation Regulation (“SFAR”) No. 44, 46 Fed. Reg. 39606 (1981). The FAA determined the maximum safe number of hourly arrivals at designated airports and allocated hourly “landing slots” among the carriers using the airports.
On May 12,1982, Braniff abruptly ceased all operations and on the following day filed a petition in the bankruptcy court below. Immediately thereafter, the FAA distributed to other carriers more than 100 of some 450 slots previously allocated to Braniff in order to minimize the effect of Braniff’s abandonment of service on the travelling public. See 47 Fed.Reg. 22492 (1982). Approximately a week later, the FAA issued SFAR No. 44-4 to provide for the allocation of the remaining abandoned slots (except for about 50 slots that the FAA retired to reduce air traffic congestion in the Dallas area) through a fandom draw under which similarly situated competing carriers would be treated equally. 47 Fed.Reg. at 22492. The more than 100 slots originally distributed on an emergency basis subsequently also *941 were assigned under a random draw procedure. See 47 Fed.Reg. 30908 (1982).
At about the time that Braniff filed its petition for reorganization, Braniff’s chairman orally asked the Administrator of the FAA to hold the slots that Braniff had been using to permit it to reorganize. Effectively granting this request, the FAA published SFAR No. 44-4 as an emergency rule. Although all landing slots always have been subject to immediate defeasance in appropriate circumstances, the SFAR provided that the allocation of former Braniff slots to other carriers:
will be for a period of up to 60 days from May 20, 1982, and may be cancelled by the FAA at the end of that 60-day period or during that period upon 24-hour notice. The temporary approval for these slots may be extended at the discretion of the Administrator.
47 Fed.Reg. at 22494.
The preamble to the regulation stated that “[i]f Braniff does again operate, then the slots necessary for continued Braniff operations will be returned to Braniff.” Id. at 22492. A subsequent stipulation was entered into among Braniff, the FAA, and certain creditors providing that, subject to FAA regulations, the slots would be returned to Braniff or a successor upon reorganization. In its order below, the District Court issued an injunction requiring the FAA to transfer slots to PSA to effectuate the PSA transaction. _ Since the district court ordered the FAA to allocate slots to PSA, and since nothing in our opinion would preclude reconsideration of the PSA transaction as a plan of reorganization, in the interest of judicial economy we will proceed to address the lower court’s authority to order this action by the FAA.
In promulgating the landing slot program, the FAA relied upon its authority under the Federal Aviation Act to “assign . .. the use of the navigable airspace under such terms, conditions, and limitations as [it] may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. [It] may modify or revoke such assignment when required in the public interest.” 49 U.S.C. § 1348(a). According to the legislative history, that Act vested “unquestionable authority for all aspects of airspace management in the [FAA] Administrator.” S.Rep. No. 1811, 85th Cong., 2d sess. 14 (1958). See also id. at 15 (Administrator given “plenary authority in the matter of air traffic rules”); H.R.Rep. No. 2360, 85th Cong., 2d sess. 6-7 (1958), U.S.Code Cong. & Admin.News 1958, p. 3741. As stated in Air Line Pilots Association, International v. Quesada, 276 F.2d 892, 894 (2d Cir.1960):
The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority — indeed, in one administrator — the power to frame rules for the safe and efficient use of the nation’s airspace.
See also City of Houston v. FAA, 679 F.2d 1184, 1195 (5th Cir.1982); Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1315 (8th Cir.1981).
The Federal Aviation Act contains explicit standards governing the exercise of the FAA’s broad authority to assign use of the navigable airspace under 49 U.S.C. § 1348(a). In addition to “insur[ing] the safety of aircraft and the efficient utilization of such airspace,” id., regulations in this area must take cognizance of such policies as the requirements of the national defense, id. § 1303, as well as the encouragement of a competitive air transportation system and “[t]he development and maintenance of a sound regulatory environment ... responsive to the needs of the public.” Id. §§ 1302(a)(4), (5), and (9), made applicable to the FAA by 49 U.S.C. § 1655(c)(1) and 49 C.F.R. § 1.47(a).
Regulations issued by the FAA to implement the policies of the statute are subject to only limited review in the courts of appeals. 49 U.S.C. § 1486(a); see, e.g., Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309 (8th Cir.1981). Congress expressly provided that the FAA’s findings of fact are “conclusive” if supported by “substantial evidence.” Id. § 1486(e).
*942 Notwithstanding Congress’ manifest intent that the FAA exercise exclusive jurisdiction over navigable airspace subject to review in the courts of appeals, Braniff argues that the landing slots are “property” of its estate and that under § 105 of the Code, 11 U.S.C. § 105, the Bankruptcy Court may issue whatever orders it thinks necessary to protect them. We disagree.
We cannot accept Braniff’s characterization of the slots as its property. We agree with the view expressed by the Eighth Circuit that SFAR’s establishing slots are “rules” as defined in the Administrative Procedure Act,[3] and do not lose their character as rules because they modify airlines’ claimed rights to slot allocations. Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1321 (8th Cir.1981). See also Air Lines Pilots Association, Int’l v. Quesada, 276 F.2d 892, 896 (2d Cir.1960) (FAA action limiting pilots’ licenses to age 60 does not lose rulemaking character because it changes pilots’ claimed property rights). The slots are actually restrictions on the use of property — airplanes; not property in themselves. As such, they are not within the jurisdiction of the Bankruptcy Court under § 105 of the Code.[4]
Moreover, even if we were to assume that the slots give rise to some limited proprietary interest so as to confer jurisdiction over them on the Bankruptcy Court, the most substantial and persuasive line of authority establishes that any transfer of a state or federal regulatory license or certificate is subject to the continuing jurisdiction and approval of the applicable agency. See e.g. LaRose v. FCC, 494 F.2d 1145, 1149 (D.C.Cir.1974) (radio license); Barutha v. Prentice, 189 F.2d 29, 31 (7th Cir.), cert. denied, 342 U.S. 841, 72 S.Ct. 69, 96 L.Ed. 635 (1951) (state motor carrier license); In re Rainbo Express, Inc., 179 F.2d 1, 5 (7th Cir.), cert. denied sub nom. Richardson v. National Acceptance Co., 339 U.S. 981, 70 S.Ct. 1029, 94 L.Ed. 1085 (1950) (ICC license); In re Airlines Transport Carriers, Inc., 129 F.Supp. 679, 683-4 (S.D.Cal.1955) (CAB letter of registration). See generally Hyde v. Woods, 94 U.S. 523, 525, 24 L.Ed. 264 (1877) (debtor’s seat on stock exchange “is incumbered with conditions” that “entered into and became an incident of the property when it was created.”).[5] At most, a determination that the slots were “property” might allow the debtor to transfer them to another carrier for purposes of the bankruptcy laws, but approval of that transfer under the Federal Aviation Act would rest solely with the FAA.
III.
Because, like the slot issue, the question of the lower courts’ authority over Braniff’s Washington National Airport lease is likely to recur if the PSA transaction is reconsidered as a plan of reorganization, we will consider it now.
The district court order authorized Braniff to assume its lease and agreements with the United States for the use of facilities and lease of space at Washington National Airport and assign them to PSA. People Express Airlines, Inc. challenges this portion of the district court’s order. We find that the district court erred in authorizing the assignment of the lease to PSA.
*943 When Braniff filed for reorganization, Braniff was lessee and user of certain airport terminal space at Washington National Airport under agreements with the United States, the owner and operator of the airport. Subsequently, Braniff and the United States reached, and the Bankruptcy Court approved, an agreement and stipulation to modify the Braniff-FAA Use and Lease Agreement. Under the modification, the United States received the right to use, occupy and lease the space at National previously leased to Braniff, while Braniff was released from its obligation to pay future rents and all post petition rent claims against Braniff were forgiven. Further, Braniff was given the right to recapture the premises upon thirty days notice in the event Braniff reinstituted operations as an air carrier at National. People Express was thereafter granted a lease on the space subject to Braniff’s right to recapture.
Section 365(c) of the Bankruptcy Code, 11 U.S.C. § 365(c), provides that the trustee in Bankruptcy may not assume or assign an unexpired lease if applicable law excuses the lessor from accepting performance from an assignee and if the lessor does not consent to assignment. The district court found § 365(c) inapplicable, stating, as have some Bankruptcy Courts, e.g. In re Taylor Mfg., Inc., 6 B.R. 370 (Bkrtcy.N.D. Ga.1980), that § 365(c) was intended to apply only to personal service contracts. Nothing in the statute authorized the district court to depart from the express language of § 365(c), which provides for its application to unexpired leases and belies any limitation to personal service contracts. It may well be that the impetus for Congress’ enactment of § 365(c) was to preserve the pre-Code rule that “applicable law” precluding assignment of personal service contracts is operative in bankruptcy. See 1 Norton, Bankruptcy Law & Practice § 23.14 (1981) (“typical” contract falling within § 365 is for personal performance). However, the drafters actually codified a much broader principle. Surely if Congress had intended to limit § 365(c) specifically to personal service contracts, its members could have conceived of a more precise term than “applicable law” to convey that meaning.
Even assuming that it were appropriate to resort to legislative history when the face of the statute is so plain, a doubtful assumption in this case, we have been referred to no history that requires the radical construction of the district court, and we found none ourselves. The district court consequently erred in finding that § 365(c) was not applicable to the BraniffUnited States lease.
Here, applicable law excuses the lessor, the United States, from accepting performance from the assignee, PSA. The Washington Airport Act, 7 D.C.Code §§ 1101— 1107, provides in part:
See. 1102. The administrator shall have control over, and responsibility for, the care, operation, maintenance, and protection of the airport, together with the power to make and amend such rules and regulations as he may deem necessary to the proper exercise thereof.
Sec. 1103. The administrator is empowered to lease upon such terms as he may deem proper, space or property within or upon the airport for purposes essential or appropriate to the operation of the airport. (Emphasis added.)
Pursuant to these provisions the FAA has promulgated 14 C.F.R. § 159.91(a) which provides:
(a) No person may engage in any commercial activity on the Airport without the approval of, and under terms and conditions prescribed by, the Airport Manager.
Applicable law, therefore, provides that the FAA is to control the leasing of space at National Airport and that no person may operate at National Airport without its approval. Since PSA has not been approved to operate at National Airport, § 365(c) excuses the FAA from accepting performance from PSA. The district court therefore erred in authorizing Braniff to assign its rights under the lease.
For the reasons we have stated, the order of the district court is REVERSED, and the *944 case is REMANDED for further proceedings consistent with this opinion.

. See In re Braniff Airways, Incorporated, et al., 700 F.2d 214 (5th Cir.1983) (district court and bankruptcy court constitutionally exercised jurisdiction pursuant to Local Rule).

. We are aware that the Code provides for certain adjustments in the rights, of creditors pursuant to a valid § 363 transaction in order to provide “adequate protection” to secured creditors. 11 U.S.C. § 363(e) (condition use, sale or lease so as to assure “adequate protection” of secured creditors’ interest); 11 U.S.C. § 361 (periodic payments, additional liens, or other relief may be used to provide adequate protection). However, nothing has been brought to our attention that would indicate that this particular provision of the PSA transaction was adopted to assure adequate protection and we do not see how it could have been. More important, the other provisions discussed in the text affect only unsecured creditors and are wholly unrelated to any issue of adequate protection. Accordingly, although some actions that technically are not “uses, sales or leases” may be authorized by § 363 and § 361 to assure “adequate protection,” the offending portions of the PSA transaction are not within that rubric.

. 5 U.S.C. § 551(4): “[A]n agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy____”

. Since the Bankruptcy Court was without subject-matter jurisdiction the stipulation allegedly allocating slots to PSA as Braniff’s successor was of no effect.

. Braniff relied principally on a dictum of this court to the effect that a bankruptcy court may stay regulatory proceedings under § 105 to the extent that they threaten the assets of the estate. SEC v. First Financial Group, 645 F.2d 429, 440 (5th Cir.1981). No such threat was present in that case and it is therefore not binding on us for that proposition. In other principal cases relied upon by Braniff, e.g. In Re Shipper’s Interstate Service, Inc., 618 F.2d 9, 13 (7th Cir. 1980); In re Bel Air Chateau Hospital, Inc., 611 F.2d 1248, 1251 (9th Cir. 1979), the proposition was also dictum. Moreover, First Financial concerned appointment by the SEC of a receiver for the debtor’s existing assets. We think that whatever vitality the “threat to assets” theory may have, it is inapplicable where, as here, the very existence of the “asset” depends on the regulatory activity in question.