09-2311-bk
In Re: Chrysler LLC et al.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: June 5, 2009                    Decided: June 5, 2009
                              Opinion filed: August 5, 2009)

Docket No. 09-2311-bk

- - - - - - - - - - - - - - - - - - - -x

IN RE CHRYSLER LLC,

                Debtor.

- - - - - - - - - - - - - - - - - - - -x

INDIANA STATE POLICE PENSION TRUST, INDIANA
STATE TEACHERS RETIREMENT FUND, and INDIANA
MAJOR MOVES CONSTRUCTION FUND,

                Objectors-Appellants,

THE AD HOC COMMITTEE OF CONSUMER-VICTIMS OF
CHRYSLER LLC,

                Objector-Apellant,

WILLIAM LOVITZ, FARBOD NOURIAN, BRIAN CATALON,
CENTER FOR AUTO SAFETY, CONSUMER ACTION,
CONSUMERS FOR AUTO RELIABILITY AND SAFETY,
NATIONAL ASSOCIATION OF CONSUMER ADVOCATES,
and PUBLIC CITIZEN,

                Objectors-Appellants,

PATRICIA PASCALE,

                Objector-Appellant,

- v.-

CHRYSLER LLC, aka Chrysler Aspen, aka Chrysler Town & Country, aka Chrysler 300, aka Chrysler Sebring, aka Chrysler PT Cruiser, aka Dodge, aka Dodge Avenger, aka Dodge Caliber, aka Dodge Challenger, aka Dodge Dakota, aka Dodge Durango, aka Dodge Grand Caravan, aka Dodge Journey, aka Dodge Nitro, aka Dodge Ram, aka Dodge Sprinter, aka Dodge Viper, aka Jeep, aka Jeep Commander, aka Jeep Compass, aka Jeep Grand Cherokee, aka Jeep Liberty, aka Jeep Patriot, aka Jeep Wrangler, aka Moper, aka Plymouth, aka Dodge Charger,

                   Debtors-Appellees,

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS UNION OF AMERICA, AFL-CIO ("UAW"),

                   Appellee,

FIAT S.P.A. and NEW CARCO ACQUISITION LLC,

                   Appellees,

CHRYSLER FINANCIAL SERVICES AMERICAS LLC,

                   Appellee,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

                   Appellee,

UNITED STATES OF AMERICA,

                   Appellee,

EXPORT DEVELOPMENT CANADA

                   Appellee.*
- - - - - - - - - - - - - - - - - - - - -x

2

* The Clerk of the Court is directed to amend the official caption as set forth above.


Before:       JACOBS, Chief Judge, KEARSE and SACK, Circuit Judges.


Appeals from an order entered in the United States Bankruptcy Court for the Southern District of New York (Gonzalez, J.) dated June 1, 2009, authorizing the sale of substantially all of debtor Chrysler LLC's assets to New CarCo Acquisition LLC.  On June 2, 2009 we granted a motion for a stay and for expedited appeal directly to this Court, pursuant to 28 U.S.C. § 158(d)(2).  On June 5, 2009, we heard oral argument, and ruled from the bench and by written order.  We affirmed the June 1, 2009 order "for the reasons stated in the opinions of Bankruptcy Judge Gonzalez," stating that an opinion or opinions would follow.  We now issue this opinion to further explain our affirmance.

AFFIRMED.


GLENN M. KURTZ, THOMAS E. LAURIA (Owen C. Pell, Karen M. Asner, *on the brief*), White & Case LLP, New York, NY for Objectors-Appellants Indiana State Police Pension Trust et al.

NANCY WINKELMAN, (M. Christine

Carty, Barry E. Bressler, Richard A. Barkasy, *on the brief*) Schnader Harrison Segal & Lewis LLP, New York, NY and Philadelphia, PA <u>for Objector-Appellant The Ad Hoc Committee of Consumer-Victims of Chrysler LLC</u>

ADINA H. ROSENBAUM, (Allison M. Zieve, *on the brief*), Public Citizen Litigation Group, Washington, D.C., and Elizabeth J. Cabraser (Robert J. Nelson, Scott P. Nealey, *on the brief*) Lieff, Cabraser, Heimann & Bernstein, LLP, San Francisco, CA, and Harley E. Riedel (Edward J. Peterson, *on the brief*) Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL <u>for Objectors-Appellants William Lovitz et al.</u>

SANDER L. ESSERMAN (Robert T. Brousseau, Jo E. Hartwick, Cliff I. Taylor, *on the brief*) Stutzman, Bromberg, Esserman & Plifka, PC, Dallas, TX, and Alan R. Brayton (Christina Skubic, *on the brief*) Brayton Purcell LLP, Novato, CA for <u>Objector-Appellant Patricia Pascale</u>

THOMAS F. CULLEN, (Corinne Ball, Steven C. Bennett, Todd R. Geremia, Veerle Roovers, *on the brief*), Jones Day, New York, NY and Washington, D.C., <u>for Debtors-Appellees Chrysler LLC et al.</u>

DEBORAH M. BUELL, (James L. Bromley, Luke A. Barefoot,

Kimberly C. Spiering, James Croft, *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for Appellee International Union of United Automobile Aerospace and Agricultural Workers of America

STEVEN L. HOLLEY (John L. Warden, Laurent S. Wiesel, *on the brief*) Sullivan & Cromwell LLP, New York, NY for Appellees Fiat S.p.A. and New CarCo Acquisition LLC

MARTIN J. BIENENSTOCK (Judy G.Z. Liu, *on the brief*) Dewey & LeBoeuf LLP, New York, NY for Appellee Chrysler Financial Services Americas LLC

KENNETH H. ECKSTEIN, (Jeffrey S. Trachtman, Thomas Moers Mayer, *on the brief*) Kramer Levin Naftalis & Frankel LLP, New York, NY for Appellee The Official Committee of Unsecured Creditors

JEANNETTE A. VARGAS, Assistant United States Attorney, (Tara LaMorte, Li Yu, David S. Jones, *on the brief*) for Lev L. Dassin, Acting United States Attorney for the Southern District of New York, New York, NY, and JOHN RAPISARDI, Of Counsel to the Presidential Task Force on the Auto Industry, Cadwalader, Wickersham & Taft LLP, New York, NY for Appellee United States of America

MICHAEL J. EDELMAN, Vedder Price

5

P.C., New York, NY for Appellee Export Development Canada

JOAN PILVER, Assistant Attorney General, (Matthew F. Fitzsimmons, *on the brief*) for Richard Blumenthal, Attorney General of the State of Connecticut, Hartford, CT for Amicus Curiae State of Connecticut

ROGER NETZER, (Lisa D. Bentley, Emma-Ann Deacon, *on the brief*) Willkie Farr & Gallagher LLP, New York, NY, and Robert G. Zack, Chief Legal Officer, Oppenheimer Senior Floating Rate Fund and Oppenheimer Master Loan Fund, LLC, New York, NY for Amici Curiae Oppenheimer Senior Floating Rate Fund and Oppenheimer Master Loan Fund, LLC

DENNIS JACOBS, Chief Judge:

The Indiana State Police Pension Trust, the Indiana State Teachers Retirement Fund, and the Indiana Major Moves Construction Fund (collectively, the "Indiana Pensioners" or "Pensioners"), along with various tort claimants and others, appeal from an order entered in the United States Bankruptcy Court for the Southern District of New York, Arthur J. Gonzalez, Bankruptcy Judge, dated June 1, 2009 (the "Sale Order"), authorizing the sale of substantially all of the debtor's assets to New CarCo Acquisition LLC ("New

6

Chrysler"). On June 2, 2009 we granted the Indiana Pensioners' motion for a stay and for expedited appeal directly to this Court, pursuant to 28 U.S.C. § 158(d)(2). On June 5, 2009 we heard oral argument, and ruled from the bench and by written order, affirming the Sale Order "for the reasons stated in the opinions of Bankruptcy Judge Gonzalez," stating that an opinion or opinions would follow. This is the opinion.

In a nutshell, Chrysler LLC and its related companies (hereinafter "Chrysler" or "debtor" or "Old Chrysler") filed a pre-packaged bankruptcy petition under Chapter 11 on April 30, 2009. The filing followed months in which Chrysler experienced deepening losses, received billions in bailout funds from the Federal Government, searched for a merger partner, unsuccessfully sought additional government bailout funds for a stand-alone restructuring, and ultimately settled on an asset-sale transaction pursuant to 11 U.S.C. § 363 (the "Sale"), which was approved by the Sale Order. The key elements of the Sale were set forth in a Master Transaction Agreement dated as of April 30, 2009: substantially all of Chrysler's operating assets (including manufacturing plants, brand names, certain dealer and supplier relationships, and much else) would be transferred

7

to New Chrysler in exchange for New Chrysler's assumption of certain liabilities and $2 billion in cash. Fiat S.p.A agreed to provide New Chrysler with certain fuel-efficient vehicle platforms, access to its worldwide distribution system, and new management that is experienced in turning around a failing auto company. Financing for the sale transaction--$6 billion in senior secured financing, and debtor-in-possession financing for 60 days in the amount of $4.96 billion--would come from the United States Treasury and from Export Development Canada. The agreement describing the United States Treasury's commitment does not specify the source of the funds, but it is undisputed that prior funding came from the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211(a)(1), and that the parties expected the Sale to be financed through the use of TARP funds. Ownership of New Chrysler was to be distributed by membership interests, 55% of which go to an employee benefit entity created by the United Auto Workers union, 8% to the United States Treasury and 2% to Export Development Canada. Fiat, for its contributions, would immediately own 20% of the equity with rights to acquire more (up to 51%), contingent on payment in full of the debts owed to the United States Treasury and Export Development Canada.

At a hearing on May 5, 2009, the bankruptcy court approved the debtor's proposed bidding procedures. No other bids were forthcoming. From May 27 to May 29, the bankruptcy court held hearings on whether to approve the Sale.[1] Upon extensive findings of fact and conclusions of law, the bankruptcy court approved the Sale by order dated June 1, 2009.

After briefing and oral argument, we affirmed the bankruptcy court's order on June 5, but we entered a short stay pending Supreme Court review. The Supreme Court, after an extension of the stay, declined a further extension. The Sale closed on June 10, 2009.

The factual and procedural background is set out in useful detail in the opinions of Bankruptcy Judge Gonzalez. This opinion is confined to a discussion of the arguments made for vacatur or reversal. The Sale Order is challenged essentially on four grounds. First, it is contended that the sale of Chrysler's auto-manufacturing assets, considered together with the associated intellectual property and (selected) dealership contractual rights, so closely approximates a final plan of reorganization that it

---

[1] Twelve witnesses testified (either live or through depositions), and 48 exhibits were introduced.

constitutes an impermissible "*sub rosa* plan," and therefore cannot be accomplished under § 363(b). We consider this question first, because a determination adverse to Chrysler would have required reversal. Second, we consider the argument by the Indiana Pensioners that the Sale impermissibly subordinates their interests as secured lenders and allows assets on which they have a lien to pass free of liens to other creditors and parties, in violation of § 363(f). We reject this argument on the ground that the secured lenders have consented to the Sale, as per § 363(f)(2). Third, the Indiana Pensioners challenge the constitutionality of the use of TARP funds to finance the Sale on a number of grounds, chiefly that the Secretary of the Treasury is using funds appropriated for relief of "financial institutions" to effect a bailout of an auto-manufacturer, and that this causes a constitutional injury to the Indiana Pensioners because the loss of their priorities in bankruptcy amounts to an economic injury that was caused or underwritten by TARP money. We conclude that the Indiana Pensioners lack standing to raise this challenge. Finally, we consider and reject the arguments advanced by present and future tort claimants.

**DISCUSSION**

We review a bankruptcy court's conclusions of law *de novo*, and its findings of fact under the clearly erroneous standard.  See Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85, 90 (2d Cir. 2003).

**I**

The Indiana Pensioners characterize the Sale as an impermissible, *sub rosa* plan of reorganization.  See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983) (denying approval of an asset sale because the debtor "should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets").  As the Indiana Pensioners characterize it, the Sale transaction "is a 'Sale' in name only; upon consummation, new Chrysler will be old Chrysler in essentially every respect.  It will be called 'Chrysler.'  . . .  Its employees, including most management, will be retained. . . .  It will manufacture and sell Chrysler and Dodge cars and minivans, Jeeps and Dodge Trucks. . . .  The

real substance of the transaction is the underlying reorganization it implements." Indiana Pensioners' Br. at 46 (citation omitted).

Section 363(b) of the Bankruptcy Code authorizes a Chapter 11 debtor-in-possession to use, sell, or lease estate property outside the ordinary course of business, requiring in most circumstances only that a movant provide notice and a hearing. 11 U.S.C. § 363(b).[2] We have identified an "apparent conflict" between the expedient of a § 363(b) sale and the otherwise applicable features and safeguards of Chapter 11.[3] Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); cf. Braniff, 700 F.2d at 940.

In Lionel, we consulted the history and purpose of § 363(b) to situate § 363(b) transactions within the overall structure of Chapter 11. The origin of § 363(b) is the Bankruptcy Act of 1867, which permitted a sale of a debtor's

---

[2] The section provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

[3] Section 363(b) may apply to cases arising under Chapters 7, 11, 12, and 13 of the Bankruptcy Code. In this case, as in Lionel, we consider only its applicability in the context of Chapter 11 cases.

assets when the estate or any part thereof was "of a perishable nature or liable to deteriorate in value." Lionel, 722 F.2d at 1066 (citing Section 25 of the Bankruptcy Act of 1867, Act of March 2, 1867, 14 Stat. 517) (emphasis omitted).  Typically, courts have approved § 363(b) sales to preserve "'wasting asset[s].'"  Id. at 1068 (quoting Mintzer v. Joseph (In re Sire Plan, Inc.), 332 F.2d 497, 499 (2d Cir. 1964)).  Most early transactions concerned perishable commodities; but the same practical necessity has been recognized in contexts other than fruits and vegetables.  "[T]here are times when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to insure that the assets do not lose value."  Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. 2326, 2342 (2008) (Breyer, J., dissenting) (internal quotation marks omitted); see also In re Pedlow, 209 F. 841, 842 (2d Cir. 1913) (upholding sale of a bankrupt's stock of handkerchiefs because the sale price was above the appraised value and "Christmas sales had commenced and . . . the sale of handkerchiefs depreciates greatly after the holidays").  Thus, an automobile manufacturing business can be within the ambit of the

13

"melting ice cube" theory of § 363(b).  As Lionel recognized, the text of § 363(b) requires no "emergency" to justify approval.  Lionel, 722 F.2d at 1069.  For example, if "a good business opportunity [is] presently available," id., which might soon disappear, quick action may be justified in order to increase (or maintain) the value of an asset to the estate, by means of a lease or sale of the assets.  Accordingly, Lionel "reject[ed] the requirement that only an emergency permits the use of § 363(b)."  Id. "[I]f a bankruptcy judge is to administer a business reorganization successfully under the Code, then  . . . some play for the operation of both § 363(b) and Chapter 11 must be allowed for."  Id. at 1071.

At the same time, Lionel "reject[ed] the view that § 363(b) grants the bankruptcy judge *carte blanche*."  Id. at 1069.[4]  The concern was that a quick, plenary sale of assets outside the ordinary course of business risked circumventing key features of the Chapter 11 process, which afford debt and equity holders the opportunity to vote on a proposed plan of reorganization after receiving meaningful

---

[4]  If unfettered use of § 363(b) had been intended, there would have been no need for the requirement of notice and hearing prior to approval.

information.  See id. at 1069-70.  Pushed by a bullying creditor, a § 363(b) sale might evade such requirements as disclosure, solicitation, acceptance, and confirmation of a plan.  See 11 U.S.C. §§ 1122-29.  "[T]he natural tendency of a debtor in distress," as a Senate Judiciary Committee Report observed, is "to pacify large creditors with whom the debtor would expect to do business, at the expense of small and scattered public investors."  Lionel, 722 F.2d at 1070 (quoting S. Rep. No. 95-989, 2d Sess., at 10 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5796 (internal quotation marks omitted)).

To balance the competing concerns of efficiency against the safeguards of the Chapter 11 process, Lionel required a "good business reason" for a § 363(b) transaction[5]:

> [A bankruptcy judge] should consider all
> salient factors pertaining to the
> proceeding and, accordingly, act to
> further the diverse interests of the
> debtor, creditors and equity holders,
> alike. [A bankruptcy judge] might, for
> example, look to such relevant factors as
> the proportionate value of the asset to
> the estate as a whole, the amount of

---

[5]  The Lionel standard has subsequently been adopted in sister Circuits.  See, e.g., Stephens Indus. v. McClung, 789 F.2d 386, 389-90 (6th Cir. 1986); Inst. Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986).

elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

722 F.2d at 1071.

After weighing these considerations, the Court in Lionel reversed a bankruptcy court's approval of the sale of Lionel Corporation's equity stake in another corporation, Dale Electronics, Inc. ("Dale"). The Court relied heavily on testimony from Lionel's Chief Executive Officer, who conceded that it was "only at the insistence of the Creditors' Committee that Dale stock was being sold and that Lionel 'would very much like to retain its interest in Dale,'" id. at 1072, as well as on a financial expert's acknowledgment that the value of the Dale stock was not decreasing, see id. at 1071-72. Since the Dale stock was not a wasting asset, and the proffered justification for selling the stock was the desire of creditors, no sufficient

16

business reasons existed for approving the sale.

In the twenty-five years since Lionel, § 363(b) asset sales have become common practice in large-scale corporate bankruptcies. See, e.g., Robert E. Steinberg, *The Seven Deadly Sins in § 363 Sales*, Am. Bankr. Inst. J., June 2005, at 22, 22 ("Asset sales under § 363 of the Bankruptcy Code have become the preferred method of monetizing the assets of a debtor company."); Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain A Viable Option for Distressed Businesses for the Twenty-First Century?,* 78 Am. Bankr. L.J. 153, 194-96 (2004). A law review article recounts the phenomenon:

> Corporate reorganizations have all but disappeared. . . . TWA filed only to consummate the sale of its planes and landing gates to American Airlines. Enron's principal assets, including its trading operation and its most valuable pipelines, were sold within a few months of its bankruptcy petition. Within weeks of filing for Chapter 11, Budget sold most of its assets to the parent company of Avis. Similarly, Polaroid entered Chapter 11 and sold most of its assets to the private equity group at BankOne. Even when a large firm uses Chapter 11 as something other than a convenient auction block, its principal lenders are usually already in control and Chapter 11 merely puts in place a preexisting deal.

Douglas G. Baird & Robert K. Rasmussen, *The End of*

17

*Bankruptcy*, 55 Stan. L. Rev. 751, 751-52 (2002) (internal footnotes omitted).  In the current economic crisis of 2008-09, § 363(b) sales have become even more useful and customary.[6]  The "side door" of § 363(b) may well "replace the main route of Chapter 11 reorganization plans."  Jason Brege, Note, *An Efficiency Model of Section 363(b) Sales*, 92 Va. L. Rev. 1639, 1640 (2006).

Resort to § 363(b) has been driven by efficiency, from the perspectives of sellers and buyers alike.  The speed of the process can maximize asset value by sale of the debtor's business as a going concern.  Moreover, the assets are typically burnished (or "cleansed") because (with certain limited exceptions) they are sold free and clear of liens, claims and liabilities.  See infra (discussing § 363(f) and tort issues).  A § 363 sale can often yield the highest price for the assets because the buyer can select the

---

[6]  For instance, Lehman Brothers sold substantially all its assets to Barclays Capital within five days of filing for bankruptcy.  Lehman Brothers filed for bankruptcy in the early morning hours of September 15, 2008.  On September 20, 2008, the bankruptcy court approved the sale to Barclays of Lehman's investment banking and capital markets operations, as well as supporting infrastructure including the Lehman headquarters in midtown Manhattan for $1.7 billion.  See Bay Harbour Mgmt., L.C. v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.), No. 08-cv-8869(DLC), 2009 WL 667301, at *8 (S.D.N.Y. Mar. 13, 2009) (affirming the § 363(b) sale order).

liabilities it will assume and purchase a business with cash flow (or the near prospect of it).  Often, a secured creditor can "credit bid," or take an ownership interest in the company by bidding a reduction in the debt the company owes.  See 11 U.S.C. § 363(k) (allowing a secured creditor to credit bid at a § 363(b) sale).

This tendency has its critics.  See, e.g., James H.M. Sprayregen et al., *Chapter 11: Not Perfect, but Better than the Alternative*, Am. Bankr. Inst. J., Oct. 2005, at 1, 60 (referencing those who "decr[y] the increasing frequency and rise in importance of § 363 sales").  The objections are not to the quantity or percentage of assets being sold: it has long been understood (by the drafters of the Code,[7] and the Supreme Court[8]) that § 363(b) sales may encompass all or

---

[7] As stated in Lionel, "[t]he Commission on the Bankruptcy Laws of the United States submitted a draft provision that would have permitted resort to section 363(b) in the absence of an emergency, even in the case of 'all or substantially all the property of the estate.'  See Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93rd Cong., 1st Sess. (1973) at 239 (proposed § 7-205 and accompanying explanatory note).  Congress eventually deleted this provision without explanation . . . ."  Lionel, 722 F.2d at 1069-70 n.3.

[8] The Supreme Court has noted that § 363(b) is sometimes used to sell all or substantially all of a debtor's assets.  In a footnote in Florida Department of Revenue v. Piccadilly Cafeterias, the Court wrote:

substantially all of a debtor's assets.  Rather, the thrust of criticism remains what it was in Lionel: fear that one class of creditors may strong-arm the debtor-in-possession, and bypass the requirements of Chapter 11 to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a reorganization in all but name, achieved by stealth and momentum.  See, e.g., Motorola, Inc. v. Official Comm. of Unsecured Creditors and J.P. Morgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 466 (2d Cir. 2007) ("The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, short circuit the requirements of Chapter 11 for confirmation of a

> Chapter 11 bankruptcy proceedings ordinarily culminate in the confirmation of a reorganization plan. But in some cases, as here, a debtor sells all or substantially all its assets under § 363(b)(1) (2000 ed., Supp. V) before seeking or receiving plan confirmation. In this scenario, the debtor typically submits for confirmation a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale.

128 S. Ct. at 2330 n.2.

reorganization plan." (internal quotation marks and alteration omitted)); Brege, *An Efficiency Model of Section 363(b) Sales*, 92 Va. L. Rev. at 1643 ("The cynical perspective is that [§ 363(b)] serves as a loophole to the otherwise tightly arranged and efficient Chapter 11, through which agents of the debtor-in-possession can shirk responsibility and improperly dispose of assets."); see also Steinberg, *The Seven Deadly Sins in § 363 Sales*, Am. Bankr. Inst. J., at 22 ("Frequently, . . . the § 363 sale process fails to maximize value . . . .").

As § 363(b) sales proliferate, the competing concerns identified in Lionel have become harder to manage. Debtors need flexibility and speed to preserve going concern value; yet one or more classes of creditors should not be able to nullify Chapter 11's requirements. A balance is not easy to achieve, and is not aided by rigid rules and prescriptions. Lionel's multi-factor analysis remains the proper, most comprehensive framework for judging the validity of § 363(b) transactions.

Adopting the Fifth Circuit's wording in Braniff, 700 F.2d at 940, commentators and courts--including ours --have sometimes referred to improper § 363(b) transactions

21

as "*sub rosa* plans of reorganization." See, e.g., In re Iridium, 478 F.3d at 466 ("The trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization."). Braniff rejected a proposed transfer agreement in large part because the terms of the agreement specifically attempted to "dictat[e] some of the terms of any future reorganization plan. The [subsequent] reorganization plan would have to allocate the [proceeds of the sale] according to the terms of the [transfer] agreement or forfeit a valuable asset." 700 F.2d at 940. As the Fifth Circuit concluded, "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." Id.

The term "*sub rosa*" is something of a misnomer. It bespeaks a covert or secret activity, whereas secrecy has nothing to do with a § 363 transaction. Transactions blessed by the bankruptcy courts are openly presented, considered, approved, and implemented. Braniff seems to have used "*sub rosa*" to describe transactions that treat the requirements of the Bankruptcy Code as something to be

evaded or subverted. But even in that sense, the term is unhelpful. The sale of assets is permissible under § 363(b); and it is elementary that the more assets sold that way, the less will be left for a plan of reorganization, or for liquidation. But the size of the transaction, and the residuum of corporate assets, is, under our precedent, just one consideration for the exercise of discretion by the bankruptcy judge(s), along with an open-ended list of other salient factors. See <u>Lionel</u>, 722 F.2d at 1071 (a bankruptcy judge should consider "such relevant factors as the proportionate value of the asset to the estate as a whole").

<u>Braniff</u>'s holding did not support the argument that a § 363(b) asset sale must be rejected simply because it is a sale of all or substantially all of a debtor's assets. Thus a § 363(b) sale may well be a reorganization in effect without being the kind of plan rejected in <u>Braniff</u>.[9] See,

---

[9] The transaction at hand is as good an illustration as any. "Old Chrysler" will simply transfer the $2 billion in proceeds to the first lien lenders, and then liquidate. The first lien lenders themselves will suffer a deficiency of some $4.9 billion, and everyone else will likely receive nothing from the liquidation. Thus the Sale has inevitable and enormous influence on any eventual plan of reorganization or liquidation. But it is not a "*sub rosa* plan" in the <u>Braniff</u> sense because it does not specifically "dictate," or "arrange" *ex ante*, by contract, the terms of

23

*e.g.*, Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 128 S. Ct. at 2330 n.2. Although Lionel did not involve a contention that the proposed sale was a *sub rosa* or *de facto* reorganization, a bankruptcy court confronted with that allegation may approve or disapprove a § 363(b) transfer that is a sale of all or substantially all of a debtor's assets, using the analysis set forth in Lionel in order to determine whether there was a good business reason for the sale. See In re Iridium, 478 F.3d at 466 & n.21 ("The trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization. . . . In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'" (citing Lionel, 722 F.2d at 1071)).

The Indiana Pensioners argue that the Sale is a *sub rosa* plan chiefly because it gives value to unsecured creditors (*i.e.*, in the form of the ownership interest in New Chrysler provided to the union benefit funds) without

---

any subsequent plan.

24

paying off secured debt in full, and without complying with the procedural requirements of Chapter 11.  However, Bankruptcy Judge Gonzalez demonstrated proper solicitude for the priority between creditors and deemed it essential that the Sale in no way upset that priority.  The lien holders' security interests would attach to all proceeds of the Sale: "Not one penny of value of the Debtors' assets is going to anyone other than the First-Lien Lenders."  Opinion Granting Debtor's Motion Seeking Authority to Sell, May 31, 2009, ("Sale Opinion") at 18.  As Bankruptcy Judge Gonzalez found, all the equity stakes in New Chrysler were entirely attributable to *new* value--including governmental loans, new technology, and new management--which were not assets of the debtor's estate.  See, e.g., id. at 22-23.

The Indiana Pensioners' arguments boil down to the complaint that the Sale does not pass the discretionary, multifarious Lionel test.  The bankruptcy court's findings constitute an adequate rebuttal.  Applying the Lionel factors, Bankruptcy Judge Gonzalez found good business reasons for the Sale.  The linchpin of his analysis was that the only possible alternative to the Sale was an immediate liquidation that would yield far less for the estate--and

for the objectors.  The court found that, notwithstanding Chrysler's prolonged and well-publicized efforts to find a strategic partner or buyer, no other proposals were forthcoming.  In the months leading up to Chrysler's bankruptcy filing, and during the bankruptcy process itself, Chrysler executives circled the globe in search of a deal. But the Fiat transaction was the *only* offer available.  Sale Opinion at 6; see id. at 16–17 ("Notwithstanding the highly publicized and extensive efforts that have been expended in the last two years to seek various alliances for Chrysler, the Fiat Transaction is the only option that is currently viable.  The only other alternative is the immediate liquidation of the company.").[10]

The Sale would yield $2 billion.  According to expert testimony[11]--not refuted by the objectors--an immediate

---

[10]   The bankruptcy court noted that Chrysler had discussed potential alliances with General Motors, Fiat, Nissan, Hyundai-Kia, Toyota, Volkswagen, Tata Motors, GAZ Group, Magna International, Mitsubishi Motors, Honda, Beijing Automotive, Tempo International Group, Hawtai Automobiles, and Chery Automobile Co.  Sale Opinion at 6.

[11]   The Indiana Pensioners moved to strike the testimony of Chrysler's valuation witness because he has a financial interest in the outcome of the case: his firm would receive a transaction fee when the Sale was consummated.  The bankruptcy court denied the motion on the grounds that such arrangements are typical; that the Indiana Pensioners did not object to the retention of the witness's

liquidation of Chrysler as of May 20, 2009 would yield in the range of nothing to $800 million.[12]  Id. at 19. Crucially, Fiat had conditioned its commitment on the Sale being completed by June 15, 2009.  While this deadline was tight and seemingly arbitrary, there was little leverage to force an extension.  To preserve resources, Chrysler factories had been shuttered, and the business was hemorrhaging cash.  According to the bankruptcy court, Chrysler was losing going concern value of nearly $100 million each day.  Sale Order at 7.

On this record, and in light of the arguments made by the parties, the bankruptcy court's approval of the Sale was no abuse of discretion.  With its revenues sinking, its factories dark, and its massive debts growing, Chrysler fit

---

firm; and that the witness's interest goes to weight of the evidence, not admissibility.  Sale Opinion at 19 n.17.  The Indiana Pensioners have not persuaded us that the bankruptcy court abused its discretion.  See generally Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138–39, 141–43 (1997); Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006) ("We review the bankruptcy court's evidentiary decisions for abuse of discretion.").

[12]  The expert's earlier estimates of liquidation value had been higher.  For example, in early May 2009, the same expert opined that a liquidation might yield between nothing and $1.2 billion.  But, from the beginning of May until the end, Chrysler expended $400 million in cash collateral. Sale Opinion at 19.

the paradigm of the melting ice cube. Going concern value was being reduced each passing day that it produced no cars, yet was obliged to pay rents, overhead, and salaries. Consistent with an underlying purpose of the Bankruptcy Code--maximizing the value of the bankrupt estate--it was no abuse of discretion to determine that the Sale prevented further, unnecessary losses. See Toibb v. Radloff, 501 U.S. 157, 163 (1991) (Chapter 11 "embodies the general [Bankruptcy] Code policy of maximizing the value of the bankruptcy estate.").

The Indiana Pensioners exaggerate the extent to which New Chrysler will emerge from the Sale as the twin of Old Chrysler. New Chrysler may manufacture the same lines of cars but it will also make newer, smaller vehicles using Fiat technology that will become available as a result of the Sale--moreover, at the time of the proceedings, Old Chrysler was manufacturing no cars at all. New Chrysler will be run by a new Chief Executive Officer, who has experience in turning around failing auto companies. It may retain many of the same employees, but they will be working under new union contracts that contain a six-year no-strike provision. New Chrysler will still sell cars in some of its

old dealerships in the United States, but it will also have new access to Fiat dealerships in the European market. Such transformative use of old and new assets is precisely what one would expect from the § 363(b) sale of a going concern.

**II**

The Indiana Pensioners next challenge the Sale Order's release of all liens on Chrysler's assets. In general, under § 363(f), assets sold pursuant to § 363(b) may be sold "free and clear of any interest" in the assets when, *inter alia*, the entity holding the interest consents to the sale. 11 U.S.C. § 363(f)(2). The bankruptcy court ruled that, although the Indiana Pensioners did not themselves consent to the release, consent was validly provided by the collateral trustee, who had authority to act on behalf of all first-lien credit holders.

We agree. Through a series of agreements, the Pensioners effectively ceded to an agent the power to consent to such a sale; the agent gave consent; and the Pensioners are bound. Accordingly, questions as to the status or preference of Chrysler's secured debt are simply not presented in this case.

29

The first-lien holders--among them, the Indiana Pensioners--arranged their investment in Chrysler by means of three related agreements: a First Lien Credit Agreement, a Collateral Trust Agreement, and a Form of Security Agreement. Together, these agreements create a framework for the control of collateral property. The collateral is held by a designated trustee for the benefit of the various lenders (including the Indiana Pensioners). In the event of a bankruptcy, the trustee is empowered to take any action deemed necessary to protect, preserve, or realize upon the collateral. The trustee may only exercise this power at the direction of the lenders' agent; but the lenders are required to authorize the agent to act on their behalf, and any action the agent takes at the request of lenders holding a majority of Chrysler's debt is binding on all lenders, those who agree and those who do not.

When Chrysler went into bankruptcy, the trustee had power to take any action necessary to realize upon the collateral--including giving consent to the sale of the collateral free and clear of all interests under § 363. The trustee could take such action only at the direction of the lenders' agent, and the agent could only direct the trustee at the request of lenders holding a majority of Chrysler's

30

debt. But if those conditions were met--as they were here-- then under the terms of the various agreements, the minority lenders could not object to the trustee's actions since they had given their authorization in the first place.

The Indiana Pensioners argue that, by virtue of a subclause in one of the loan agreements, Chrysler required the Pensioners' written consent before selling the collateral assets. The clause in question provides that the loan documents themselves could not be amended without the written consent of *all* lenders if the amendment would result in the release of all, or substantially all, of the collateral property. This clause is no help to the Indiana Pensioners. The § 363(b) Sale did not entail amendment of any loan document. To the contrary, the § 363(b) sale was effected by implementing the clear terms of the loan agreements--specifically, the terms by which (1) the lenders assigned an agent to act on their behalf, (2) the agent was empowered, upon request from the majority lenders, to direct the trustee to act, and (3) the trustee was empowered, at the direction of the agent, to sell the collateral in the event of a bankruptcy. Because the Sale required no amendment to the loan documents, Chrysler was not required to seek, let alone receive, the Pensioners' written consent.

31

Anticipating the consequence of this contractual framework, the Indiana Pensioners argue as a last resort that the majority lenders were intimidated or bullied into approving the Sale in order to preserve or enhance relations with the government, or other players in the transaction. Absent this bullying, the Pensioners suggest, the majority lenders would not have requested the agent to direct the sale of the collateral, and the Sale would not have gone through. The Pensioners argue that this renders the lenders' consent ineffective or infirm.

The record before the bankruptcy court, and the record before this Court, does not support a finding that the majority lenders were coerced into agreeing to the Sale. On the whole, the record (and findings) support the view that they acted prudently to preserve substantial value rather than risk a liquidation that might have yielded nothing at all. Moreover, it is not at all clear what impact a finding of coerced consent would have on the validity of the consent given, or whether the bankruptcy court would have jurisdiction--or occasion--to adjudicate the Indiana Pensioners' allegation. Because the facts alleged by the Indiana Pensioners are not substantiated in this record, their arguments based on those allegations provide no ground

32

for relief in this proceeding, and we decline to consider whether the allegations might give rise to some independent cause of action.

**III**

The Indiana Pensioners argue that the Secretary of the Treasury ("Secretary") exceeded his statutory authority and violated the Constitution by using TARP money to finance the sale of Chrysler's assets. Pensioners raise interesting and unresolved constitutional issues concerning the scope of the Secretary's authority under TARP and the use of TARP money to bail out an automobile manufacturer. However, federal courts are constrained by our own constitutional limitations, including the non-waivable Article III requirement that we have jurisdiction over the case or controversy before us. See, e.g., United States v. Hays, 515 U.S. 737, 742 (1995); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); United States v. City of New York 972 F.2d 464, 469-70 (2d Cir. 1992). We do not decide whether the Secretary's actions were constitutional or permitted by statute, because we conclude that the Indiana Pensioners lack standing to raise the TARP issue, and that

33

we lack jurisdiction in this case to entertain that challenge.

Congress enacted the Emergency Economic Stabilization Act ("EESA") on October 3, 2008 in order "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the Unites States . . . ." 12 U.S.C. § 5201(1). Title I of EESA authorizes the Treasury Secretary "to establish the Troubled Asset Relief Program (or 'TARP') to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution, on such terms and conditions as are determined by the Secretary." Id. § 5211(a)(1). Financial institutions include, but are not limited to, "any bank, savings association, credit union, security broker or dealer, or insurance company." Id. § 5202(5).

The statute details procedures for judicial review of the Secretary's decisions, limitations on available relief for TARP violations, and a host of legislative oversight mechanisms. See, e.g., id. §§ 5214-15, 5229(a), 5233. For example, courts review the Secretary's TARP decisions in accordance with standards set forth in the Administrative

34

Procedure Act, 5 U.S.C. § 701 *et. seq.*, and the Secretary's actions "shall be held unlawful and set aside if found to be arbitrary, capricious, an abuse of discretion, or not in accordance with law." 12 U.S.C. § 5229(a)(1). Injunctions are available only to remedy constitutional violations and must be "considered and granted or denied by the court on an expedited basis," id. § 5229(a)(2)(A),(C),(D); likewise, requests for temporary restraining orders must be considered and decided by the court "within 3 days of the date of the request," id. § 5229(a)(2)(B). As for legislative oversight, the statute calls for (among other things) the creation of the Financial Stability Oversight Board, which reviews the exercise of the Secretary's authority (§ 5214), the submission of periodic reports from the Secretary to Congress (§ 5215), the creation of a Congressional Oversight Panel to provide periodic updates to Congress (§ 5233), and the appointment of a special TARP Inspector General (§ 5214(a)(3)). In short, the statute provides swift, narrow, and deferential judicial review of the Secretary's TARP decisions, limits judicial relief, and relies instead on multi-faceted legislative oversight.

The Indiana Pensioners contend that the Secretary

exceeded his statutory authority and violated the Constitution by using TARP money to fund the Sale because, *inter alia*: auto companies are not "financial institutions" under TARP; TARP does not authorize the Secretary to arrange and finance the reorganization of a private company; and the Sale effects an unconstitutional taking.  In sum, they contend that the Secretary--and by extension, the Executive branch--violated the Constitution by dispensing federal money in excess of the statutory authority awarded by Congress under TARP.[13]

It is clear that TARP gives the Secretary broad discretion to apply financial aid when and where he decides it will best promote the stated goal of restoring stability to the financial markets.  But, as detailed above, TARP also contains explicit limitations on the Secretary's authority, and provides for review and oversight, so that TARP is not all-purpose.  At oral argument, the government suggested that any industry so "inter-related" with banks that its dealings could adversely impact the national banking system

---

[13] See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 562, 585 (1952) (Executive power "must stem either from an act of Congress or from the Constitution itself.").

is, for TARP purposes, a financial institution.[14]  This is surely an expansive definition of "financial institution," albeit broadly protective of the nation's financial structures and arguably related to TARP's mandate of "restor[ing] liquidity and stability" to our markets.  The scope of TARP is a consequential and vexed issue that may inevitably require resolution in some later case; but this Court lacks power to resolve it in the present dispute.

Article III of the Constitution limits the judicial power of the United States to the resolution of "cases" and "controversies."  U.S. Const. art. III, § 2.  This limitation is effectuated in part through the requirement of

---

[14]  The government asserted at oral argument that:

> [T]he Secretary of the Treasury, in determining what is a financial institution, looks at the interrelatedness [of the company and its financing arm].
>
> . . . .
>
> Chrysler Financial can't survive without Chrysler. . . . Without [Chrysler], the financial institution goes down. . . . [Chrysler Financial] is the financial institution and the relationship [with Chrysler is the one] that the Secretary of the Treasury based his determination on, and that determination is entitled to deference by this court under administrative law principles.

Transcript of Oral Argument at 52.

37

standing.  See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471-72 (1982).  The doctrine of standing separates "those disputes which are appropriately resolved through the judicial process," Whitmore v. Arkansas, 495 U.S. 149, 155 (1990), from those "generalized grievances" which are reserved for other branches of government, Valley Forge, 454 U.S. at 475 (internal quotation marks omitted).  The requirement of standing would be unnecessary if the "federal courts [were] merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding."  Id. at 473.

At an "irreducible constitutional minimum," Article III standing requires that: (1) the plaintiff suffer an injury in fact; (2) the injury be fairly traceable to the challenged conduct; and (3) the injury will likely be redressed by a favorable decision from the court.  Lujan, 504 U.S. at 560-61.  "The party invoking federal jurisdiction bears the burden of establishing these elements."  Id. at 561.  We conclude that the Indiana Pensioners lack standing because they cannot demonstrate they have suffered an injury in fact.

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" Lujan, 504 U.S. at 560 (internal citations, quotation marks and footnote omitted). The Indiana Pensioners contend primarily that their injury in fact arises from the release of the collateral supporting their secured loans. But that collateral was released in exchange for a $2 billion cash payment and a residual deficiency claim. At oral argument, the Pensioners touted the value of the collateral at "around $25 billion" and complained that the value received pursuant to the Sale was a tithe of the actual asset value and an inadequate return on their investment. However, the Indiana Pensioners' argument ignores the bankruptcy court's *finding* that, in the absence of another buyer, the only viable alternative--liquidation-- would yield an even *lower* return than the one achieved through the sale funded by TARP money. Judge Gonzales found, as a fact, that the liquidation value of the collateral "was no greater than $2 billion, *i.e.*, the same amount the first lien secured lenders are receiving under the transaction." Opinion and Order Regarding Emergency

Economic Stabilization Act of 2008 and Troubled Asset Relief Program, May 31, 2009, at 5.  Since "the Indiana [Pensioners] will receive [their] pro-rata distribution of the value of the collateral," they simply "cannot allege injury in fact."  Id.  The release of collateral for fair (but less-than-hoped-for) value is not injury in fact sufficient to support standing.

Furthermore, even if the Indiana Pensioners could demonstrate injury in fact, there would still be a question as to whether they have standing to challenge the use of TARP funds here.  Under the terms of the various agreements (as outlined in Section II), the lenders had authorized the trustee to consent to the Sale on their behalf.  Under those circumstances (and well-established agency principles), such consent may bar the Pensioners from challenging the trustee's actions and litigating a claim that would in effect bind all of the first-lien creditors.

**IV**

Finally, several objectors appeal from that portion of the Sale Order extinguishing all existing and future claims against New Chrysler, that "(a) arose prior to the Closing

40

Date, (b) relate[] to the production of vehicles prior to the Closing Date or (c) otherwise [are] assertable against the Debtors or [are] related to the Purchased Assets prior to the closing date." Sale Order at 40. The objectors can be divided into three groups: (1) plaintiffs with existing product liability claims against Chrysler; (2) plaintiffs with existing asbestos-related claims against Chrysler; and (3) lawyers undertaking to act on behalf of claimants who, although presently unknown and unidentified, might have claims in the future arising from Old Chrysler's production of vehicles. We consider each group's arguments in turn.

**A.   Existing Product Liability Claims**

The Ad Hoc Committee of Consumer-Victims of Chrysler LLC and William Lovitz et al. challenge the foreclosing of New Chrysler's liability for product defects in vehicles produced by Old Chrysler.[15] Section 363(f) provides, in relevant part, that a "trustee may sell property . . . free and clear of *any interest in such property*," under certain

_____

[15]   The Sale Order does not limit the right of tort plaintiffs to pursue existing claims against Old Chrysler. However, it is undisputed that little or no money will be available for damages even if suits against Old Chrysler succeed.

41

circumstances. 11 U.S.C. § 363(f) (emphasis added). The objectors argue that personal injury claims are not "interests in property," and that the district court's reliance on In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003) ("TWA"), which advances a broad reading of "interests in property," was misplaced.

We have never addressed the scope of the language "any interest in such property," and the statute does not define the term. See, e.g., Precision Indus., Inc. v. Qualitech Steel SBQ, LLC, 327 F.3d 537, 545 (7th Cir. 2003) ("The Bankruptcy Code does not define 'any interest,' and in the course of applying section 363(f) to a wide variety of rights and obligations related to estate property, courts have been unable to formulate a precise definition.").

In TWA, the Third Circuit considered whether (1) employment discrimination claims and (2) a voucher program awarded to flight attendants in settlement of a class action constituted "interests" in property for purposes of § 363(f). See 322 F.3d at 285. The Third Circuit began its analysis by noting that bankruptcy courts around the country have disagreed about whether "any

interest" should be defined broadly or narrowly.[16]  Id. at 288-89.  The Third Circuit observed, however, that "the trend seems to be toward a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'"  Id. at 289 (quoting 3 Collier on Bankruptcy ¶ 363.06[1]); see also George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process*, 76 Am. Bankr. L.J. 235, 267 (2002) ("[T]he dominant interpretation is that § 363(f) can be used to sell property free and clear of

---

[16]  For examples of bankruptcy courts' divergent rulings on this issue, compare, e.g., P.K.R. Convalescent Ctrs., Inc. v. Commonwealth of Va., Dept. of Med. Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.), 189 B.R. 90, 94 (Bankr. E.D. Va. 1995) (holding that Virginia's depreciation-recoupment interest in the debtor's property was an "interest in property," even though the interest was not a lien), and Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (holding that § 363(f) permitted the sale of assets free and clear and precluded successor liability in product liability suit against purchaser for cause of action that arose prior to date of sale), with Schwinn Cycling and Fitness, Inc. v. Benonis (In re Schwinn Bicycle Co.), 210 B.R. 747, 761 (Bankr. N.D. Ill. 1997) (holding that § 363(f) "in no way protects the buyer from current or future product liability; it only protects the purchased assets from lien claims against those assets"), and Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that "[g]eneral unsecured claimants including tort claimants, have no specific interest in a debtor's property" for purposes of § 363(f)).

claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability.").

The Third Circuit reasoned that "to equate interests in property with only *in rem* interests such as liens would be inconsistent with section 363(f)(3), which contemplates that a lien is but one type of interest." 322 F.3d at 290. After surveying its owns precedents and the Fourth Circuit's decision in United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573 (4th Cir. 1996),[17] the TWA court held that "[w]hile the interests of the [plaintiffs] in the assets of TWA's bankruptcy estate are not interests in property in the sense that they are not *in rem* interests, . . . they are interests in property within the meaning of section 363(f) in the sense that they *arise from the property* being sold."

---

[17] In Leckie, the Fourth Circuit held that Coal Act premium payment obligations owed to employer-sponsored benefit plans were interests in property under § 363(f). 99 F.3d at 582. The Fourth Circuit explained "while the plain meaning of the phrase 'interest in such property' suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to *in rem* interests, strictly defined, and [it would] decline to adopt such a restricted reading of the statute . . . ." Id.

44

322 F.3d at 290 (emphasis added).

Shortly after TWA was decided, the Southern District of California concluded that TWA applied to tort claimants asserting personal injury claims. See Myers v. United States, 297 B.R. 774, 781-82 (S.D. Cal. 2003). Myers involved claims arising from the negligent handling of toxic materials transported pursuant to a government contract. Id. at 781. Applying TWA, the Myers court ruled that the plaintiff's "claim for personal injury does arise from the property being sold, i.e. the contracts to transport toxic materials." Id.; see also Faulkner v. Bethlehem Steel/Int'l Steel Group, No. 2:04-CV-34 PS, 2005 WL 1172748, at *3 (N.D. Ind. April 27, 2005) (applying TWA to bar successor liability for racial discrimination claim).

Appellants argue that these decisions broadly construing the phrase "any interest in such property" fail to account for the language of 11 U.S.C. § 1141(c), a provision involving confirmed plans of reorganization. Section 1141(c) provides that "except as otherwise provided in the [reorganization] plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of *all claims and interests* of creditors, equity security holders, and of general partners

45

in the debtor."  11 U.S.C. § 1141(c) (emphasis added).
Appellants argue that Congress must have intentionally
included the word "claims"[18] in § 1141(c), and omitted the
word from § 363(f), because it was willing to extinguish
tort claims in the reorganization context, but unwilling to
do so in the § 363 sale context.  Appellants account for
this discrepancy on the basis that reorganization provides
unsecured creditors procedural rights that are not assured
in a § 363(b) sale.

We do not place such weight on the absence of the word
"claims" in § 363(f).  The language and structure of
§ 1141(c) and § 363(f) differ in many respects.  Section
1141(c), for example, applies to all reorganization plans;

---

[18]  The Bankruptcy Code defines "claim" as:

> (A) right to payment, whether or not such
> right is reduced to judgment, liquidated,
> unliquidated, fixed, contingent, matured,
> unmatured, disputed, undisputed, legal,
> equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for
> breach of performance if such breach
> gives rise to a right to payment, whether
> or not such right to an equitable remedy
> is reduced to judgment, fixed,
> contingent, matured, unmatured, disputed,
> undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

§ 363(f), in contrast, applies only to classes of property that satisfy one of five criteria.  See 11 U.S.C. § 363(f)(1)-(5).  Thus, while § 363 sales do not afford many of the procedural safeguards of a reorganization, § 363(f) is limited to specific classes of property.

Given the expanded role of § 363 in bankruptcy proceedings, it makes sense to harmonize the application of § 1141(c) and § 363(f) to the extent permitted by the statutory language.  See In re Golf, L.L.C., 322 B.R. 874, 877 (Bankr. D. Neb. 2004) (noting that, while § 363(f) requires less notice and provides for less opportunity for a hearing than in the reorganization process, "as a practical matter, current practice seems to have expanded § 363(f)'s use from its original intent").  Courts have already done this in other contexts.  For example, § 1141(c) does not explicitly reference the extinguishment of liens, while § 363(f) does.  Notwithstanding this distinction, courts have uniformly held that confirmation of a reorganization can act to extinguish liens.  See, e.g., JCB, Inc. v. Union Planters Bank, NA, 539 F.3d 862, 870 (8th Cir. 2008) ("Confirmation of the reorganization plan replaces prior obligations, and a lien not preserved by the plan may be extinguished." (internal citation omitted)); Elixir Indus.,

47

*Inc. v. City Bank & Trust Co. (In re Ahern Enters., Inc.)*, 507 F.3d 817, 820-22 (5th Cir. 2007) (holding that § 1141(c) extinguishes liens that are not specifically preserved in a reorganization plan, and citing cases from the Fourth, Seventh, Eighth and Tenth Circuits reaching the same conclusion).

We agree with *TWA* and *Leckie* that the term "any interest in property" encompasses those claims that "arise from the property being sold." See *TWA*, 322 F.3d at 290. By analogy to *Leckie* (in which the relevant business was coal mining), "[appellants'] rights are grounded, at least in part, in the fact that [Old Chrysler's] very assets have been employed for [automobile production] purposes: if Appellees had never elected to put their assets to use in the [automobile] industry, and had taken up business in an altogether different area, [appellants] would have no right to seek [damages]." *Leckie*, 99 F.3d at 582.

"To allow the claimants to assert successor liability claims against [the purchaser] while limiting other creditors' recourse to the proceeds of the asset sale would be inconsistent with the Bankruptcy Code's priority scheme." *TWA*, 322 F.3d at 292. Appellants ignore this overarching principle and assume that tort claimants faced a choice

48

between the Sale and an alternative arrangement that would have assured funding for their claims. But had appellants successfully blocked the Sale, they would have been unsecured creditors fighting for a share of extremely limited liquidation proceeds. Given the billions of dollars of outstanding secured claims against Old Chrysler, appellants would have fared no better had they prevailed.

The possibility of transferring assets free and clear of existing tort liability was a critical inducement to the Sale. As in TWA, "a sale of the assets of [Old Chrysler] at the expense of preserving successor liability claims was necessary in order to preserve some [55],000 jobs, . . . and to provide funding for employee-related liabilities, including retirement benefits [for more than 106,000 retirees]." TWA, 322 F.3d at 293; see also Sale Opinion at 3.

It is the transfer of Old Chrysler's tangible and intellectual property to New Chrysler that could lead to successor liability (where applicable under state law) in the absence of the Sale Order's liability provisions. Because appellants' claims arose from Old Chrysler's property, § 363(f) permitted the bankruptcy court to authorize the Sale free and clear of appellants' interest in

the property.

## B. Asbestos Claims

On behalf of herself and others with outstanding or potential claims against Old Chrysler resulting from exposure to asbestos, Patricia Pascale argues that the Sale Order improperly grants New Chrysler immunity without assuring compliance with 11 U.S.C. § 524(g).

Section 524(g) "provides a unique form of supplemental injunctive relief for an insolvent debtor confronting the particularized problems and complexities associated with asbestos liability." Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 517 F.3d 52, 67 (2d Cir. 2008), overruled on other grounds by Travelers Indem. Co. v. Bailey, 129 S.Ct. 2195 (2009). The statute authorizes the court "to enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any [asbestos-related] claim or demand." 11 U.S.C. § 524(g)(1)(B). To obtain relief under § 524(g), a debtor must "[c]hannel[] asbestos-related claims to a personal injury trust [to] relieve[] the debtor of the uncertainty of future asbestos liabilities." In re Combustion Eng'g, Inc.,

391 F.3d 190, 234 (3d Cir. 2004). Injunctions granting relief under this provision are subject to numerous requirements and conditions. See 11 U.S.C. § 524(g)(2)(B); Combustion Eng'g, 391 F.3d at 234 & n.45.

By its terms, however, § 524(g) applies only to "a court that enters an order confirming a plan of reorganization under chapter 11." 11 U.S.C. § 524(g)(1)(A); see also Combustion Eng'g, 391 F.3d at 234 n.46. Sections I and II of this opinion conclude that the Sale was proper under § 363. That determination forecloses the application of § 524(g) because there is no plan of reorganization as yet. Moreover, the bankruptcy court in this case did not issue an injunction, as is permitted by § 524(g)(1)(B), and the debtor did not establish a trust subsuming its asbestos liability. Accordingly, there is no merit to Pascale's argument that the Sale Order violates § 524(g).

## C. Future Claims

The Sale Order extinguished the right to pursue claims "on any theory of successor or transferee liability, . . . whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated." Sale Order at 40-

41. This provision is challenged on the grounds that: (1) the Sale Order violates the due process rights of future claimants by extinguishing claims without providing notice; (2) a bankruptcy court is not empowered to trump state successor liability law; (3) future, unidentified claimants with unquantifiable interests could not be compelled "to accept a money satisfaction," 11 U.S.C. § 363(f)(5); and (4) future causes of action by unidentified plaintiffs based on unknown events cannot be classified as "claims" under the Bankruptcy Code.

We affirm this aspect of the bankruptcy court's decision insofar as it constituted a valid exercise of authority under the Bankruptcy Code. However, we decline to delineate the scope of the bankruptcy court's authority to extinguish future claims, until such time as we are presented with an actual claim for an injury that is caused by Old Chrysler, that occurs after the Sale, and that is cognizable under state successor liability law.

**CONCLUSION**

We have considered all of the objectors-appellants' contentions on these appeals and have found them to be

52

without merit.  For the foregoing reasons, we affirm the June 1, 2009 order of the bankruptcy court authorizing the Sale.